**EXHIBIT B**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROMMIS HOLDINGS, LLC, et al.,[1] | ) Case No. 13-10551(BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 303** |
| | ) |
| | ) |

### ORDER APPROVING DEBTORS' MOTION TO APPROVE (I) SALE OF CERTAIN ASSETS OF INTERFACE, INC. TO CYPRESS INNOVATIONS, INC. PURSUANT TO 11 U.S.C. § 363(b); (II) ASSUMPTION AND ASSIGNMENT OF DESIGNATED LEASES AND CONTRACTS, AND (III) RELATED BIDDING AND SALE PROCEDURES

Upon the motion (the "Motion")[2] pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order (the "Sale Order"), approving and authorizing (i) the sale (the "Sale") of certain assets of debtor Interface, Inc. ("Interface") to Cypress Innovations, Inc. (the "Buyer"), (ii) the assumption, assignment and sale of designated leases and contracts (the "Designated Agreements," and together with all other estate assets, estate executory contracts and estate unexpired leases included in the proposed transaction (the "Purchased Assets"), as to (i) and (ii), free and clear of all liens, claims,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Prommis Holdings, LLC (6940); Prommis Fin Co. (2965); Prommis Solutions, LLC (9978); E-Default Services LLC (0016); Statewide Tax and Title Services LLC (0049); Statewide Publishing Services LLC (0079); Nationwide Trustee Services, Inc. (2436); Statewide Tax and Title Services of Alabama LLC (7733); Nationwide Trustee Services of Virginia, Inc. (6687); Interface Inc. (9903); and Prommis Homeownership Solutions, Inc. (0569). The location of the Debtors' headquarters and the Debtors' service address is 400 Northridge Road, Atlanta, Georgia, 30350.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

interests and encumbrances, and (iii) related bidding and sale procedures; and it appearing that due and proper notice of the Motion has been given under the circumstances; and a hearing having been held on May 29, 2013 to consider the relief requested in the Motion (the "Hearing"); and upon consideration of the record of the Hearing and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 7052 and 9014.

B.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    The Court has jurisdiction over the Motion and the estate asset elements of the transactions contemplated by the Purchase Agreement (the "Transactions") pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D.    Proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the sale of the Purchased Assets, the assumption and assignment of any and all rights with respect to the Designated Agreements (the "Assignments"), the terms and conditions of the Purchase Agreement, and all of the other Transactions has been provided in accordance with Bankruptcy Code sections 102(1), 363, 365, and 1146(a), Bankruptcy Rules 2002, 6004, 6006, and 9014, and

2

the Local Rules, such notice was good, sufficient, and appropriate under the particular circumstances, and except as otherwise set forth in this Order, no other or further notice of the Motion, the Sale Hearing, the sale of the Purchased Assets, or the Assignments, is or shall be required.

E.     A true and correct copy of the Purchase Agreement is attached hereto as Exhibit 1.

F.     The Debtors and Sellers have extensively marketed the Purchased Assets.

G.     The Bidding Procedures were appropriate and necessary in order to maximize value for the Purchased Assets, and provided proper procedures for the qualification of competing bidders, the submission of qualified overbids, and for the conduct of the auction (the "Auction") to determine the highest and best bidder.

H.     The Administrative Agent (at the direction of the Requisite First Lien Lenders (as defined in the Credit Agreement)) has had at all relevant times the right to "credit bid" the full amount of its claims on behalf of the Lenders in connection with the sale of the Purchased Assets contemplated in the Motion.

I.     The Sellers (i) have full entity governance power and authority to execute the Purchase Agreement and all other documents contemplated thereby (collectively, the "Sale Documents"), and the sale of the Purchased Assets by the Sellers has been duly and validly authorized by all necessary entity governance actions, (ii) have the requisite entity power and authority necessary to consummate the Transactions and the Assignments, (iii) have taken all entity governance action necessary to authorize and approve the Sale Documents and the consummation by the Sellers of the Transactions contemplated thereby, and (iv) require no consents or approvals, other than as set forth in this Order or as expressly provided for in the Purchase Agreement, to consummate the Transactions.

3

J.      The Sellers have demonstrated and proven to the satisfaction of this Court good, sufficient, and sound business purposes and justifications for the sale of the Purchased Assets, the Assignment, and consummation of the Transactions contemplated by the Purchase Agreement and this Order, pursuant to Bankruptcy Code sections 363(b) and 365(f)(2). Entry into the Purchase Agreement, the Assignment, and consummation of the Transactions constitutes the exercise by the Sellers of sound business judgment and such acts are in the best interests of the Debtors' estates. The business reasons justifying the sale of the Purchased Assets include, but are not limited to, the following facts: (a) the Purchase Agreement constitutes the highest and best offer for the Purchased Assets; (b) the Purchase Agreement and the closing of the Transactions will present the best opportunity to realize the maximum value of the Purchased Assets; and (c) the consideration provided by the Buyer for the purchase of the Purchased Assets pursuant to the Sale Documents exceeds what the Sellers would otherwise be able to realize in a separate liquidation of the Purchased Assets.

K.      The Sale Documents and the Transactions contemplated by the Sale Documents were negotiated and have been and are undertaken by the Sellers and the Buyer at arm's-length, without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). As a result of the foregoing, the Sellers and the Buyer are entitled to the protections of Bankruptcy Code section 363(m). Neither the Sellers nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or any other Sale Document to be avoided under Bankruptcy Code section 363(n). The Buyer has not otherwise violated Bankruptcy Code section 363(n) by any action or inaction, and the Transactions do not violate the provisions of Bankruptcy Code section 363(n). The Buyer is not an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31).

4

L.      The aggregate consideration provided by the Buyer for the Purchased Assets and the Assignments pursuant to the Sale Documents (i) is fair and reasonable, (ii) is the highest or best offer for the Purchased Assets, and (iii) will provide a greater recovery for the Debtors' estates than would be provided by any other practical, available alternative. The terms and conditions of each of the Sale Documents are fair and reasonable. Therefore, the sale contemplated by the Purchase Agreement is in the best interests of the Debtors, their estates, and other parties in interest, and is an exercise of the Debtors' sound business judgment.

M.      The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets and, except as otherwise set forth in the Sale Documents, will vest the Buyer with all right, title, and interest of the Sellers in and to the Purchased Assets, free and clear of all Liens and Interests of any kind or nature whatsoever.

N.      The Debtors may sell the Purchased Assets free and clear of all Liens and Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)–(5) has been satisfied. Specifically, each entity with a security interest in the Purchased Assets, if any such entity exists other than the Agents and the Lenders, has consented to the sale, is deemed to have consented to the sale, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest, or the sale of the Purchased Assets otherwise satisfies the requirements of Bankruptcy Code section 363(f). To that end, those nondebtor parties with Interests in the Purchased Assets who did not object, or who withdrew their objections, to the Purchase Agreement or the Motion are deemed to have consented to such sale pursuant to Bankruptcy Code section 363(f)(2). Those nondebtor parties with Interests in the Purchased Assets who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Interests, if any, attach to the cash proceeds of the Transactions ultimately attributable to the Purchased Assets against or in which

5

they assert an Interest with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors and/or other parties in interest possess with respect thereto.

O.     Approval of the Sale Documents, the Assignments, and consummation of the sale of the Purchased Assets at this time, solely with respect to the estate property elements of the Purchase Agreement, are in the best interests of the Debtors, their estates, their stakeholders, and other parties in interest.

For all of the foregoing reasons and after due deliberation, the Court hereby ORDERS, ADJUDGES, AND DECREES that:

### General Provisions

1.     The Motion is GRANTED as set forth herein.

2.     The Sale of the Purchased Assets to the Buyer is approved and authorized in all respects.

### Bidding Procedures Approved

3.     The Bidding Procedures Notice attached hereto as Exhibit 2 is approved.

4.     The Debtors' actions in implementing the Bidding Procedures are approved and ratified in all respects.

### Objections Overruled

5.     Any and all objections and responses concerning the Motion are resolved in accordance with the terms of this Order. To the extent any such objections or responses were not otherwise withdrawn, waived, or settled, all such objections, and all reservations of rights or relief requested therein, are hereby overruled on the merits and denied with prejudice.

### Fair Consideration; Good Faith Purchaser

6.     The consideration provided by the Buyer for the Purchased Assets shall be deemed for all purposes to constitute value and fair consideration under the Bankruptcy Code and

6

any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision, of the Bankruptcy Code.

7.      The Sale is undertaken by the Buyer in good faith, the Buyer is a purchaser in good faith of the Purchased Assets as that term is used in Bankruptcy Code section 363(m), and the Buyer is entitled to all of the protections afforded by Bankruptcy Code section 363(m); accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale of the Purchased Assets to the Buyer, unless such authorization is duly stayed pending such appeal.

<div align="center">Approval of the Agreements and Authority to Close</div>

8.      The Debtors are authorized and directed to take any and all actions necessary or appropriate to: (i) consummate the sale of the Purchased Assets to the Buyer (including, without limitation, to convey to the Buyer any and all of the Purchased Assets) and the closing of the Sale in accordance with the Motion, the Purchase Agreement, and this Order; and (ii) perform, consummate, implement and close fully the Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement. The parties shall have no obligation to proceed with the closing of the Purchase Agreement and Sale until all conditions precedent to their obligations to do so as set forth therein have been met, satisfied or waived.

9.      Section 2.1 of the Purchase Agreement shall govern proceeds allocation solely as between Sellers and Buyer for their transactional, financial and business purposes; provided, however, that the Court makes no determination as to the allocation of proceeds for purposes of the bankruptcy cases, including but not limited to, any determination of the extent to which such proceeds are the cash collateral of the Lenders, and allocation as among Debtor entities and

<div align="center">7</div>

Debtor affiliate entities, and all parties' rights are expressly reserved with respect to such determinations.

<div align="center">Sale Free and Clear</div>

10.    In accordance with Bankruptcy Code section 363(f), upon the closing of the Sale, (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Purchased Assets to the Buyer free and clear of any and all liens, claims, and encumbrances, and (b) except as otherwise expressly provided in the Purchase Agreement, all such liens, claims, and encumbrances in Purchased Assets which are estate assets shall be and hereby are released, terminated, and discharged as to the Buyer and such Purchased Assets.

11.    Subject to the occurrence of the closing of the Sale, this Order (a) is and shall be effective as a determination that, upon closing, all liens, claims, and encumbrances existing as to the Purchased Assets which are estate assets conveyed to the Buyer have been and hereby are adjudged and declared to be unconditionally released, discharged, and terminated, and (b) is and shall be binding upon and govern the acts of all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets conveyed to the Buyer. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded liens, claims, and encumbrances against the Purchased Assets from their records, official and

<div align="center">8</div>

otherwise and including without limitation those liens, claims, and encumbrances listed in the applicable schedules to the Purchase Agreement, if any.

12.     If any person or entity, which has filed statements or other documents or agreements evidencing liens, claims, and encumbrances on or in the Purchased Assets shall not have delivered to the Debtors prior to the closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, claims, and encumbrances, and any other documents necessary for the purpose of documenting the release of all liens, claims, and encumbrances which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and Purchased Assets are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

13.     Except as expressly permitted or otherwise specifically provided by the Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, employees, and other creditors, holding Liens and Interests of any kind or nature whatsoever (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Effective Date of the Plan or the closing, the transfer of the Purchased Assets to the Buyer, or the Assignments to the Buyer, are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' Liens and Interests.

9

14.     Any release by any of the Debtors of the Buyer shall be conditioned upon the Buyer's payment in full of the Purchase Price to the Debtors in accordance with Section 2.1 of the Purchase Agreement.

<center>Assignment and Assumption of Assumed Contracts</center>

15.     The Debtors are hereby authorized, in accordance with section 365(b) of the Bankruptcy Code, which shall include the authorization to permit the Debtors to: (i) assume and assign to Buyer, the Designated Agreements, with payment of all cure amounts thereunder through the Closing Date (the "Cure Amounts") being made in accordance with terms of the Purchase Agreement; and (ii) execute and deliver to Buyer such assignment documents as may be necessary to sell, assign, and transfer the Designated Agreements.

16.     Pursuant to Bankruptcy Code section 365(f)(2), the Assignments are authorized and approved, and following consummation of the Assignments, the Debtors shall be absolved, released, and otherwise free from any and all liability and obligations arising from or related to the Designated Agreements pursuant to Bankruptcy Code section 365(k).

17.     Buyer's adequate assurance of future performance under the Designated Agreements shall consist solely of its promise to perform pursuant to the terms and conditions of those agreements.

18.     Upon the Closing of the Purchase Agreement in accordance with this Sale Order, any and all defaults under the Designated Agreements shall be deemed cured in all respects.

19.     All provisions limiting the assumption and/or assignment of any of the Designated Agreements are invalid and unenforceable pursuant to Bankruptcy Code section 365(f). The foregoing shall also apply to any transfer of the Purchased Assets to one or more of Buyer's affiliates or designees in connection with the Purchase Agreement.

<center>10</center>

20.    Upon the request of the Debtors or the Buyer, each party to a Designated Agreement that is subject to a lease or prime lease is hereby directed to promptly deliver to Buyer a copy of such lease or prime lease.

21.    Each of the counterparties to the Designated Agreements is hereby directed to promptly and fully cooperate with respect to the consummation of the Purchase Agreement and the transactions contemplated thereby.  Such counterparties shall, if requested by the Debtors, Sellers, or Buyer, deliver true and complete copies of all Designated Agreements and any information relating thereto and shall further execute and deliver memoranda of lease in recordable form, estoppel certificates and all other agreements, documents, certificates, and other instruments that may be requested by the Debtors, Sellers, or Buyer.

<center>Additional Provisions</center>

22.    This Order and the Purchase Agreement shall be binding in all respects upon all creditors and equity holders of any of the Debtors and Buyers, all successors and assigns of the Debtors, Buyers, and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons," or other fiduciaries appointed in the Debtors' bankruptcy cases or upon a conversion to chapter 7 under the Bankruptcy Code, and the Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.

23.    Under no circumstances shall the Buyer be deemed a successor of or to the Debtors, their bankruptcy estates, or the Sellers for any claims, Liens, or Interests against or in the Debtors, or the Purchased Assets, of any kind or nature whatsoever other than as provided for in the Purchase Agreement or this Order.

24.    The Purchase Agreement and any related agreements, documents, or other instruments may be modified amended, or supplemented by the parties thereto, in a writing signed by the parties, and in accordance with the terms thereof, without further order of the Court,

<center>11</center>

provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

25.     Upon the closing of the Sale, and pursuant to the Purchase Agreement, Interface, Inc.'s name shall be changed to Ponderosa Closing Corp.

26.     Nothing contained in any order entered in the Debtors' bankruptcy cases subsequent to entry of this Order, or in any chapter 11 plan confirmed in these chapter 11 cases, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

27.     This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h), 6006(d), and any other provision of the Bankruptcy Code or Bankruptcy Rules is expressly lifted.

28.     The provisions of this Order are nonseverable and mutually dependent.

29.     The failure specifically to include or make reference to any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement is authorized and approved in its entirety.

30.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

31.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

32.    The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Dated: May 29, 2013

The Honorable Brendan Linehan Shannon
United States Bankruptcy Judge

13

# Exhibit 1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is hereby entered into this 14th day of May, 2013, by and between Cal-Western Reconveyance Corporation, a California corporation ("Cal"), Reliable Reconveyance Corporation, a California corporation ("Reliable"), and Interface Inc. a California corporation ("Interface, together with Cal and Reliable, collectively, "Sellers") and Prommis Solutions, LLC, a Delaware limited liability company ("Prommis"), solely with respect to the transfer of the Prommis Lease (as defined below) and Cypress Innovations, Inc., a Nevada corporation or its affiliated assignee ("Buyer"), based upon the following recitals:

### WITNESSETH:

WHEREAS, the Sellers own and operate related and affiliated trustee service and mailing companies (the "Business"); and

WHEREAS, Interface (Case No. 13-10560 (BLS) and Prommis (Case No. 13-10553 (BLS) are debtors in bankruptcy cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and as such, its entry into and performance of this Agreement is subject to approval by the Bankruptcy Court (the "Requisite Bankruptcy Court Approval"); and

WHEREAS, Sellers are desirous of selling the assets identified on Exhibit A-1, A-2 and A-3 (collectively, the "Assets") to Buyer and Buyer is desirous of assuming the same from each Seller, provided the same are free and clear of all liens and encumbrances as of Closing; and

WHEREAS, Sellers are desirous of transferring certain leases for real property (the "Premises") as identified on Exhibit B-1 (the "Prommis Lease") and Exhibit B-2 (the "Interface Lease" and together with the Prommis Lease the "RP Leases") and leases for personal property set forth on B-3 (the "Personal Property Lease") to Buyer and Buyer is desirous of assuming the same from Sellers; and

WHEREAS, Sellers are desirous of transferring all accounts receivable of the Sellers (collectively, the "Accounts Receivable"), which outstanding balance as of April 30, 2013 are as follows: (a) Cal's accounts receivable as of April 30, 2013 less over 90 day amounts and accounts receivable credits, which balance is $1,898,071.34, (b) Reliable's accounts receivable as of April 30, 2013 less over 90 day amounts and accounts receivable credits, which balance is $93,830.48 and (c) Interface's accounts receivable as of April 30, 2013 less over 90 day amounts and accounts receivable credits, which balance is $504,245.46, which together with Cal's and Reliable's Accounts Receivable as of April 30, 2013 equals $2,496,147.28 (the "Target AR Balance"); all as disclosed by Sellers, for purposes of calculation of the Purchase Price and all work in progress being conducted by the Sellers for their customers (collectively the "Work in Progress"); and

WHEREAS, Sellers shall remain liable for any and all employment obligations relating to their respective employees; provided, however, that effective after Closing and to ensure contiguity of business operations Buyer shall hire at least eighty percent (80%) of the employees

of Sellers, in the aggregate, or such greater number as is required so as not to cause any WARN Act (as defined below) notification or other requirements or liabilities; and

WHEREAS, at Closing, each Seller shall file change its name and shall coordinate the filing of any such amendment changing its names with Buyer's filing of companies with the same names (including any fictitious firm name statements, trademarks, tradenames, service marks and web domains) and Buyer may operate under the names used by Sellers as of the date hereof, to ensure contiguity of business operations.

NOW, THEREFORE, in consideration for the mutual covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties hereto agree as follows:

1.    **SALE**.

1.1    At the Closing, as hereinafter defined, (i) Sellers shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase and accept from each Seller the following: the Assets, the Interface Lease, the Personal Property Lease and the Accounts Receivable and (ii) Prommis shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase and accept from Prommis all rights and obligations under the Prommis Lease. The Assets shall be transferred to Buyer at Closing free and clear of any and all liens, claims, encumbrances, pledges, mortgages and security interests. Notwithstanding anything contained herein, the Assets shall not include any governmental licenses, cash or other assets and properties of (i) the Sellers (other than those listed in Exhibit A-1, A-2 and A-3) and (ii) Prommis (other than the Prommis Lease) shall remain assets of the appropriate Seller or Prommis, as applicable.

1.2    Buyer shall not assume any of Prommis' or Sellers' obligations, debts or liabilities as a result of the purchase of the Assets other than any and all liabilities and obligations under the following: (a) the RP Leases, (b) the Personal Property Lease, (c) the Work in Progress and (d) any other liabilities and obligations expressly assumed by Buyer in this Agreement (collectively the "Assumed Obligations").

2.    **PURCHASE PRICE**.

2.1    There are different purchase prices for different items being transferred under this Agreement, all payable under different terms. The purchase price ("Purchase Price") for the Assets is $4.4 million and the 1060 Allocation for the Assets shall be determined in good faith by agreement between the parties hereto within 60 days after the Closing. Upon agreement to such allocation each party shall file all returns and other tax documents in accordance with such 1060 Allocation. The Purchase Price shall be paid by Buyer by wire transfer of immediately available funds to an account(s) designated by Sellers pursuant to the following:

(a)  At the Closing (i) $1.5 million <u>minus</u> (ii) an amount equal to any unpaid rent amounts incurred under the RP Leases for the period ending as of the date immediately prior to the Closing Date; <u>plus</u> (iii) an amount equal to (x) the aggregate rent paid pursuant to the RP Leases for rent in the month of the Closing, multiplied by (y) a fraction, the numerator of which is the number of days remaining in such month following the Closing Date and the denominator of which is the number of total days in the month; <u>plus</u> (iv) an amount equal to the aggregate amount of all security deposits or similar deposits paid under the RP Leases; <u>minus</u> (v) an amount equal to (x) $300 multiplied by (y) the number of days between the Closing Date and the first day of the month in which the Closing occurs; <u>minus</u> (vi) if the balance of the Accounts Receivable as of the Closing Date (the "Closing AR Balance") is less than the Target AR Balance, an amount equal to (x) the Target AR Balance minus (y) the Closing AR Balance; and <u>plus</u> (vii) if the Closing AR Balance is greater than the Target AR Balance, an amount equal to (x) the Closing AR Balance minus (y) the Target AR Balance.

(b)  $500,000 on that date that is three months after the Closing Date;

(c)  $1 million on that date that is six months after the Closing Date; and

(d)  $1.4 million on that date that is nine months after the Closing Date.

Notwithstanding anything to the contrary herein, upon the Closing, the obligations of Buyer to pay the amounts set forth under Sections 2.1(b)-(d) shall be absolute and not subject to satisfaction of any conditions (other than passage of time until due date) or set-off.

3.  **REPRESENTATIONS AND WARRANTIES.**

3.1  **Sellers**. Sellers, jointly and severally, represent and warrant to Buyer that:

(a)  Each Seller is a California corporation, duly incorporated, validly existing and in good standing under the laws of the State of California. Prommis is a limited liability company, duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

(b)  Each of Seller and Prommis has the necessary corporate power and authority to enter into and perform all of its obligations under this Agreement, except for the Requisite Bankruptcy Court Approval.

(c)  Each Seller has good and marketable title to the Assets listed on such Seller's respective Exhibit A.

(d) None of Seller or Prommis has received written notice of any condemnation or zoning proceedings which would detrimentally affect the Premises in any way, nor has any Seller received written notice of any governmental proceeding or action which would detrimentally affect the Business or Premises or the use and operation thereof.

(e) The execution, delivery and performance of this Agreement will not, with or without the giving of notice and/or the passage of time, violate any provision of law applicable to any Seller, or conflict with or result in the breach or termination of, or constitute a default under or pursuant to any indenture, mortgage, deed of trust, lease or other agreement or instrument by which Seller or the Assets are bound, or result in the creation of any lien, charge or encumbrance upon any of the Assets, except the Requisite Bankruptcy Court Approval and Required Consents (defined below).

(f) There are no actions, suits or proceedings pending or, to the Knowledge of Sellers, threatened against any Seller in any court or before any administrative agency which would prevent it from completing the transactions provided for herein, other than the Requisite Bankruptcy Court Approval. For purposes hereof the term "Knowledge of Sellers" shall mean the actual knowledge of the executive officers of each Seller.

(g) No consent or approval or authorization of any governmental authority (as defined below) or private party (other than the Requisite Bankruptcy Court Approval) is required in connection with the execution, delivery, and performance of this Agreement by Sellers and Prommis, except for those consents, approvals, or authorizations required by the RP Leases, the Personal Property Lease and the contracts related to the Accounts Receivable and the Work in Progress (the "Requisite Consents").

(h) The RP Leases attached as Exhibit B are true and correct copies and are in full force and effect and binding obligations of each Seller that is a party thereto. No event has occurred that would constitute a breach or default of the RP Leases or the Personal Property Lease by Sellers or Prommis that are a party thereto, or, to the Knowledge of Sellers, any other party thereto.

(i) Upon execution and delivery thereof by Sellers and Prommis, as applicable, of this Agreement, the Transition Services Agreement, in the form attached hereto as Exhibit C (the "Transition Services Agreement"); the Bill of Sale, in the form attached hereto as Exhibit F (the "Bill of Sale"), the Assignment and Assumption

Agreement, in the form attached hereto as Exhibit E (the "Assignment and Assumption Agreement" and collectively with the Transition Services Agreement and the Bill of Sale, the "Transaction Agreements") shall constitute legal, valid and binding obligations of each of the Sellers, enforceable in accordance with their respective terms.

(j)     As of the Closing Date, no representation or warranty by the Sellers hereunder or in any of the Transaction Agreements contains any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

(k)     Buyer acknowledges and agrees that except for the representations and warranties expressly set forth in this Section 3.1, the transactions contemplated by this Agreement and each other Transaction Agreement are being consummated AS IS WITHOUT ANY REPRESENTATION OR WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY.

3.2     **Buyer**.  Buyer represents and warrants to Sellers that:

(a)     Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Nevada.

(b)     Buyer has the valid corporate power to enter into and perform all of its obligations under this Agreement and this Agreement has been authorized by all necessary corporate action.

(c)     There are no actions, suits, or proceedings pending or, to the knowledge of Buyer, threatened against Buyer in any court or before any administrative agency which would prevent Buyer from completing the transactions provided for herein, except for the cases before the Bankruptcy Court.  For purposes hereof the term "knowledge of Buyer" shall mean the actual knowledge of the executive officers of Buyer.

(d)     No consent or approval or authorization of any governmental authority or private party is required in connection with the execution, delivery and performance of this Agreement by Buyer (other than Requisite Bankruptcy Court Approval).

(e)     Upon execution and delivery thereof by Buyer, this Agreement and the Transaction Agreements shall constitute legal, valid and

binding obligations of Buyer, enforceable in accordance with their respective terms.

3.3 **Closing.** The representations and warranties of Sellers and Buyer contained in this Agreement shall be true at the Closing but shall not survive the Closing.

4. <u>**CONDITIONS PRECEDENT TO CLOSING**</u>.

4.1 The obligations of Buyer to purchase the Assets and perform hereunder and to pay the Initial Purchase Price is subject to satisfaction in full of each of the following conditions (any one or more of which may be waived by Buyer in writing).

    (a) All terms, covenants, agreements and conditions of this Agreement to be complied with and performed by each Seller on or prior to Closing shall have been fully complied with and performed in all material respects and all of the representations and warranties continued in Paragraph 3.1, <u>supra,</u> shall be true on the Closing Date in all material respects as if made on as of such date;

    (b) Evidence acceptable to Buyer that Sellers' lender shall have authorized the release of or released all liens on all Assets or other items that might be collateral to said lenders that are being conveyed pursuant to this Agreement and Buyer shall be satisfied of such lien releases ("Collateral");

    (c) There shall be no tax liens, state or federal, or other Liens, on any portions of the Collateral. For purposes hereof: "Lien" means any state or federal tax lien, any mortgage, charge, pledge, lien, encumbrance, assignment, hypothecation, right of set-off, claim, or any other agreement or arrangement having the effect of conferring security, provided "Liens" shall not include liens for taxes not yet due; any carrier's, warehouseman's, mechanic's, materialman's, repairman's, landlord's or similar statutory or inchoate liens incidental to the ordinary conduct of Sellers' business which involve obligations that are not yet due; or any liens which do not, and would not reasonably be expected to, individually or in the aggregate, materially adversely affect the value, or the continued use, of the Assets in the same or similar manner as such are currently, and as of the Closing Date, being used by Sellers.

    (d) Buyer's lender shall have approved all Collateral, including but not limited to the Accounts Receivable, in values sufficient to pay the Purchase Price.

(e)     Each Seller shall have delivered to Buyer the instruments, documents and certificates described in Paragraph 7, infra.

(f)     The Transaction Agreements and the transactions contemplated thereby shall have been duly authorized, which authorizations shall be in full force and effect and true and accurate copies of such authorizations shall have been delivered to Buyer.

(g)     As of the Closing Date, no legal or governmental action, suit or proceeding shall have been instituted or threatened before any court, administrative agency or tribunal, nor shall any order, judgment or decree have been issued or proposed to be issued by any court, administrative agency or tribunal to set aside, restrain, enjoin or prevent the consummation of this Agreement or the transactions contemplated hereby.

(h)     As to Interface and Prommis, entry by the Bankruptcy Court of an order or orders providing the Requisite Bankruptcy Court Approval.

4.2     The obligations of each Seller to sell the Assets to Buyer at the Closing are subject to the satisfaction at or before Closing of each of the following conditions (any one or more of which may be waived by each Seller in writing).

(a)     All terms, covenants, agreements and conditions of the Agreement to be complied with and performed by Buyer on or prior to Closing shall have been fully complied with and performed in all respects and all of the representations and warranties contained in Paragraph 3.2 supra, shall be true on the Closing date in all material respects as if made on and as such date.

(b)     Buyer shall have delivered to Sellers the Initial Purchase Price pursuant to Section.

(c)     As of the Closing Date, no legal or governmental action, suit or proceeding shall have been instituted or threatened before any court, administrative agency or tribunal, nor shall any order, judgment or decree have been issued or proposed to be issued by any court, administrative agency or tribunal to set aside, restrain, enjoin or prevent the consummation of this Agreement or the transactions contemplated hereby.

(d)     Sellers shall have obtained consent of its lenders, in the form acceptable to Sellers of the transactions contemplated by this Agreement;

       (e)     As to Interface and Prommis, entry by the Bankruptcy Court of an order or orders providing the Requisite Bankruptcy Court Approval.

## 5.   DAMAGE TO OR DESTRUCTION OF ASSETS; TERMINATION.

**5.1**   **Risk of Loss.** If the Assets being sold hereunder shall be substantially damaged or destroyed by fire, casualty, or other majeure event prior to the time of Closing, Sellers shall immediately notify Buyer thereof and furnish to Buyer a written statement of the amount of insurance, if any, payable on account thereof. For purposes of this transaction, the Assets shall be deemed to be substantially damaged or destroyed if the cost of replacement or repair of all damage prior to completion of this transaction will exceed $10,000. Within 5 business days after receipt of notice of any such damage or destruction and the written statement of insurance payable on account thereof, Buyer may elect to terminate this Agreement by written notice of termination to Sellers if the amount of uninsured losses exceeds $100,000. Upon such termination, neither party shall have any further obligation hereunder, nor shall Buyer have any obligation to Sellers' creditors. In the event Buyer fails to make such election to terminate within such 5 business day period, this transaction shall be completed in accordance with the terms hereof and any and all insurance proceeds payable to Sellers by reason of such damage or destruction shall be deemed an Asset and the right to receive such payment shall be assigned to Buyer at the Closing. If property is not substantially damaged, it shall be repaired or replaced at the applicable Seller's expense prior to completion of this transaction and the Closing shall be extended, if necessary, for a reasonable period in order to permit such repairs or replacement.

**5.2**   **Maintenance of Assets.** Prior to Closing, Sellers shall use commercially reasonable efforts to operate the Business in the usual and ordinary course, including with respect to maintaining the Assets to be transferred pursuant to this Agreement and each Seller's relationship with its employees.

**5.3**   **Termination.** This Agreement may be terminated prior to the Closing as follows:

       (a)     by mutual written agreement of Buyer and Sellers;

       (b)     by Buyer pursuant to Section 5.1;

       (c)     by either Buyer or Sellers if there shall be in effect an order restraining, enjoining or otherwise prohibiting, or if the Bankruptcy Court does not enter an order approving, the consummation of the transactions contemplated hereby;

       (d)     by either Buyer or Sellers (provided, that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have

been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants or obligations set forth in this Agreement on the part of the other party, which breach is not cured within 10 days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing; and

(e)   by Buyer or Sellers on any day on or after May 31, 2013 if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Buyer and Sellers in writing), unless the Closing has not occurred due to a material failure of such party to perform or observe their respective agreements as set forth in this Agreement required to be performed on or before the Closing Date.

5.4   **Effect of Termination or Breach; Specific Performance.**  If this Agreement is terminated in accordance with Section 5.3: (a) this Agreement shall become null and void and of no further force and effect, except (i) for this Section 5.4, (ii) Article VIII, and (iii) that the termination of this Agreement for any cause shall not relieve any party hereto from any liability which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination; and (b) subject to section (a)(iii), if this Agreement is terminated for any reason, Buyer shall not be entitled to any damages, losses, payment or repayment from Buyer, and Sellers shall have no further obligation or Liability of any kind to Buyer, any of their Affiliates, or any Third Party on account of this Agreement. Buyer hereby acknowledges and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by it in accordance with their specific terms or were otherwise breached by it, that the Sellers will have no adequate remedy at law and that monetary damages would not be a sufficient remedy for any such failure or breach, and accordingly, each Seller shall be entitled, in addition to any other of its rights hereunder (whether at law, in equity or by contract), to specific performance of the terms of this Agreement, including, without limitation, an injunction or injunctions to specifically enforce the terms and provisions hereof in any court of competent jurisdiction (subject to the jurisdictional provisions of Section 8.2 of this Agreement), without the necessity of posting any bond or other security and without the necessity of establishing that monetary damages would not be an adequate remedy.

6.      **REMEDIES, INDEMNIFICATION AND POST CLOSING OBLIGATIONS.**

6.1     **No Indemnification Obligation of Sellers or Prommis.** For the avoidance of doubt, none of Prommis' or the Sellers' representations, warranties, covenants or agreements contained in this Agreement shall survive the Closing, and no Seller shall have any liability, responsibility or obligations to Buyer any of its affiliates or any other person in respect thereof following Closing; provided Sellers shall indemnify and hold harmless Buyer from any and all Losses incurred as a result of any Sellers' breach of its covenants in Section 2.1 (solely with respect to filings in accordance with the Allocation Statement), Section 6.8, Section 8.6, or Section 8.11.

6.2     **Buyer's Indemnification.** Buyer agrees to indemnify and hold each Seller harmless from any and all losses, claims, demands, actions, judgments and liabilities (including, without limitation, reasonable attorneys' fees) (collectively "Losses") arising out of (i) any breach by Buyer of any of its covenants and agreements under this Agreement, including but not limited to payment of the Purchase Price and other covenants under this Section 6 and (ii) the operation of the Business subsequent to the Closing. Additionally, Buyer hereby covenants and agrees to pay and to indemnify and hold Sellers harmless for any and all registration, document or filing fees and any and all gross receipts, sales, use, value added, stamp and similar transfer taxes and any and all fines, penalties and interest relating thereto (but not including any tax imposed on the gross or net income of the applicable Seller), if any, that are required to be paid in connection with the purchase, sale and delivery of, and transfer of title to, the Assets and all other items transferred pursuant to this Agreement

6.3     **Employees.** Buyer shall offer employment immediately prior to the Closing (but contingent on the occurrence of the Closing) to certain employees of Sellers as determined by Buyer in its sole discretion (such employees who accept such offer of employment, the "Rehired Employees"). Buyer's shall hire the greater of at least eighty percent (80%) of the employees of each Seller or such other number and on such other terms and conditions so as not to give rise to any Seller having any obligations or liabilities under the Worker Adjustment and Retraining Notification Act of 1988, as amended or any similar state, local or foreign Laws (the "WARN Act"). Buyer shall be responsible and assume (and shall indemnify and hold the Sellers harmless from and against) all Losses incurred by any Seller under the WARN Act as a result of the transactions contemplated hereby and the termination of each of Seller's employees in connection with the Closing.

6.4     **Cooperation.** Buyer and Sellers jointly covenant and agree that, from and after the Closing Date, Buyer and Sellers will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (a) the preparation of an audit of any state of federal tax return of any Seller or Buyer for all periods prior to or including the Closing Date and (b) any audit of any Seller with respect to the

sales, transfer and similar taxes imposed by the laws of any state or political subdivision thereof, relating to the transactions contemplated by this Agreement. In furtherance hereof, Buyer and Sellers further covenant and agree to respond promptly to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith.

6.5     **Access and Preservation of Information.**  Buyer acknowledges that Interface and Prommis has filed, and after the Closing Date Cal and Reliable shall within 3 business days after the Closing Date file, bankruptcy petitions under Chapter 7 or Chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). In connection therewith, and subject to the obligation of any Seller under the Bankruptcy Code to preserve records, and any Seller's right under the Bankruptcy Code to abandon or dispose of such records for a period of 24 months after the Closing Date (to the extent such party remains in existence), each party hereto shall preserve and provide each other party hereto or their successor (including a liquidating trustee) and their representatives reasonable access to, including the right to photocopy, all of the books and records relating to the Business or the Assets, including all employee records or other personnel and medical records as required in the possession of such party in connection with the Assumed Obligations, or other matters relating to or affected by the operation of the Business and the Assets.  Such access shall be afforded by the party in possession of such books and records upon receipt of reasonable advance notice and during normal business hours; provided, however, that (a) any such investigation shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party or its affiliates, (b) no party shall be required to take any action which would constitute a waiver of the attorney-client privilege and (c) no party need supply any information which such party is under a legal obligation not to supply.  If the party in possession of such books and records shall desire to dispose of any such books and records upon or prior to the expiration of such period, such party shall, prior to such disposition, give the other party or their successor (including a liquidating trustee), if applicable, a reasonable opportunity at such other party's expense, to segregate and remove such books and records as such other party or its successor may select.

6.6     **License.**  On the Closing Date and until the 90th day after Closing, Buyer will grant Seller a royalty-free, nonexclusive license to use any and all of the computer software (including source code, executable code, data, databases and related documentation) included in the Assets being transferred to Buyer at Closing, including but not limited to the software known as "TESS" solely for the purpose to access software as they relate to the Pite Duncan law firm.

6.7     **Work in Progress.**  After the Closing Date, Buyer and each of its affiliates and subsidiaries shall perform the Work in Progress in accordance with the respective terms of each Seller's contractual obligations with respect to such Work in Progress and shall indemnify the Sellers for any Losses related to any claims,

actions, suits or demands brought by any customers of the Work in Progress against the Sellers after the Closing Date; provided, further, that Sellers remain liable for claims made with respect to such Work in Progress completed prior to the Closing Date. All rents and utilities incurred on or after the Closing Date shall be the obligation of the Buyer.

6.8    **Post Closing Obligations.** After the Closing Date, each of the Sellers hereby covenants and agrees to provide the following:

6.8.1    After the Closing Date, but as soon as practicable (but in any event within one (1) business day after the later of (i) the date of such deposit and (ii) if such Seller has filed bankruptcy, the date a bankruptcy court with jurisdiction over such assets of such Seller permits), transfer to an account designated by Buyer any funds received by any Seller in satisfaction of the Accounts Receivable or for Work in Progress or other services conducted by Buyer for customers of the Business after Closing. Sellers shall provide detailed reports evidencing amounts in escrow (tied to specific client files) and ACH payments (tied to specific client files) concurrent with deliveries of the funds. Sellers agree to provide Buyer with reasonable documentation evidencing compliance with this Section 6.8.

6.8.2    Such further assurances as set forth in Section 8.7, including but not limited to, establishing directions at the bank for the forwarding of funds to accounts designated by Buyer, obtaining any consent necessary from Pitney Bowes to assign to Buyer the benefits of the Personal Property Lease and executing any documents provided by Buyer necessary in obtaining UCC-3 termination statements for liens on any portion of the Assets not obtained prior to Closing.

6.9    **Rents.** Buyer shall pay and any and all rents and utilities incurred on or after the Closing Date with respect to the Premises; said rents and utilities shall be the obligation of the Buyer on and after the Closing Date.

7.    **CLOSING.**

7.1    **Time and Place of Closing.** The closing of the transactions contemplated herein (the "Closing" or "Closing Date") shall take place at a time and date and place mutually agreed upon by the parties at such time as all conditions precedent to Closing have been satisfied by the parties or waived by the party holding such condition in its favor.

7.2    **Sellers' Delivery.** At the Closing, Sellers shall deliver to Buyer, in form and content acceptable to Buyer's counsel:

(a)    The Bill of Sale executed by each Seller:

(b)     Possession of the Premises under any Real Property Leases and other Assets, and all keys to the Premises;

(c)     The Assignment and Assumption Agreement executed by each Seller and Prommis;

(d)     The Transition Services Agreement, in the form attached hereto, executed by each Seller and Prommis;

(e)     Copies of filed documents as are necessary to permit the transfer or license of the names of the Business;

(f)     A certificate executed by an officer of each Seller providing copies of the authorizing resolutions of each Seller; and

(g)     A certificate of an officer of each Seller certifying that the conditions set forth in Section 4.1(a) have been satisfied or waived.

7.3     **Buyer's Delivery**. At the Closing, Buyer shall deliver to Sellers:

(a)     Payment of the Initial Purchase Price.

(b)     The Bill of Sale executed by Buyer;

(c)     The Assignment and Assumption Agreement executed by Buyer;

(d)     The Transition Services Agreement executed by Buyer;

(e)     A certificate of an officer of Buyer certifying that the conditions set forth in Section 4.2(a) have been satisfied or waived.

8.     **MISCELLANEOUS**.

8.1     **Notices**. Any and all notices and demands by either party hereto, required or desired to be given hereunder, shall be in writing and shall be deemed validly given or made if served personally or deposited in the United State Mail, postage prepaid, certified mail, return receipt requested, addressed as follows:

If to Sellers:     Cal-Western Reconveyance Corporation
400 Northridge Road
Atlanta, Georgia 30350
Attention:     Charles Piper
Hillary Shaw

With a copy to (which shall not constitute notice):

> Womble Carlyle Sandridge & Rice, LLP
> 222 Delaware Avenue, Suite 1501
> Wilmington, DE 19801
> Attention: Steven K. Kortanek, Esq.

If to Buyer:        Robert H. Hosch, Jr.
13800 Montfort Drive STE 300
Dallas TX 75240

With a copy to (which shall not constitute notice):

> Law Offices of Mary J. Drury & Associates
> 5130 South Fort Apache Road #215-290
> Las Vegas, Nevada 89148
> Attention:    Mary J. Drury, Esq.

Either party may change its address for the purposes of receiving notices or demands as herein provided by giving a written notice in the manner aforesaid to the other party. All notices shall be as specific as reasonably necessary to enable the party receiving same to respond thereto.

8.2     **Applicable Law**. The laws of the State of California shall govern the validity, construction, performance and effect of this Agreement in all respects (regardless of conflict of law principles). Any action or proceeding arising out of or relating to this Agreement or any of the Transaction Agreements shall be brought (a) in the United States Bankruptcy Court for the District of Delaware, or, (b) in the event that both Prommis' and Interface's bankruptcy case have been dismissed under Bankruptcy Code section 1112, in a federal or state court of competent jurisdiction located in the State of California, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum and THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTION AGREEMENTS.

8.3     **Partial Invalidity**. If any term, provision, covenant or condition of this Agreement, or any application thereof, should be held by a court of competent jurisdiction to be invalid, void or enforceable, all provisions, covenants and conditions of this Agreement, and all applications thereof, not held invalid, void or unenforceable, shall continue in full force and effect and shall in no way be affected, impaired or invalidated thereby.

8.4     **Interpretation**. The following rules of interpretation shall apply to this Agreement: (i) the singular includes the plural and the plural includes the

singular; (ii) "or" is not exclusive and "include" and "including" are not limiting; (iii) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (iv) a reference to a person includes its successors and permitted assigns; (v) except as otherwise expressly provided herein, a reference herein to this Agreement or any other document, instrument or agreement (whether or not defined in this Agreement) means this Agreement or such other document, instrument or agreement as originally implemented or executed or as amended, varied, modified or supplemented in accordance with its terms from time to time; and (vi) except as otherwise expressly provided herein, a reference herein to an Article, Section, Exhibit, Schedule or Appendix without further reference is to the relevant Article, Section, Exhibit, Schedule or Appendix of this Agreement.

8.5     **Attorney's Fees.**  Each party shall bear its own expenses, including, but not necessarily limited to legal fees, incident to the negotiation and preparation of this agreement and consummation of the transactions contemplated hereby.

8.6     **Broker's Fees.**  Neither party has entered into any arrangement with a broker or third party for payment of a commission or finder's fee of any sort whatsoever that the other party shall be obligated to pay, and in the event of such a claim is made by any third person, the party incurring the obligation shall indemnify the other party against any fees and expenses, including reasonable attorneys fees, or judgments related thereto.

8.7     **Further Assurances.** Sellers and Buyer agree, upon the reasonable request of the other party, at any time and from time to time, promptly to execute and deliver all such further documents, and promptly to take all such action, as may be reasonably necessary or appropriate in order more effectively to confirm or carry out the provisions of this Agreement and the other documents entered into in connection therewith or to permit such party to enforce the rights and benefits assigned to it or retained by it hereunder and thereunder.

8.8     **Amendments in Writing**. No amendment, modification, waiver, termination or discharge of any provision of this Agreement, nor any consent to any departure by any Seller or Buyer from any provision hereof, shall in any event be effective unless the same shall be in writing and signed by both parties hereto, and each such amendment, modification, waiver, termination or discharge shall be effective only in the specific instance and for the specific purpose for which it is given. No provision of this Agreement shall be varied, contradicted or explained by any oral agreement, course of dealing or performance or any other matter not set forth in an agreement in writing and signed by the parties hereto.

8.9     **Survival**. Notwithstanding anything contained herein to the contrary, all agreements, covenants and indemnities of Buyer and all agreements and covenants of each Seller contained in this Agreement shall survive the Closing

Date and the expiration or other termination hereof. All representations and warranties of each of the Buyer and Sellers shall not survive the Closing Date and none of Buyer or any Seller shall have any obligations or liabilities related to such after the Closing Date.

8.10 **Expenses**. Except as otherwise set forth in this Agreement, each Seller and Buyer shall bear its own expenses in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, including its own attorney's fees, broker's or finder's fees and disbursements. If either party shall have incurred costs and expenses (including attorneys' fees and expenses) in order to have the other party then in default perform its obligation under this Agreement, then the latter party shall reimburse the former party for all of those costs and expenses.

8.11 **Confidentiality**. Sellers and Buyer agree to treat this Agreement and the terms hereof as confidential and not to, without the prior written consent of the other party hereto, disclose the terms hereof to any other Person (other than the terms which are generally available to the public other than by means of a breach of this Section, except (a) to its counsel and accountants or other agents or professional advisers in connection with or relating to the transactions contemplated by this Agreement, (b) any court, governmental agency or instrumentality or other supervising body requesting or requiring such disclosure, including but not limited to in connection with any bankruptcy action involving any Seller; (c) to any person as may be required by any government regulation or order (including any regulation, request or order of a bank regulatory agency or authority), law, statute, rules, regulations, decrees, subpoenas or court orders, (d) its directors, officers, employees, affiliates, successors and assigns, (e) to any banks or other financial institutions (and any of their respective advisers) in any debt financing or to obtain any consents required for the benefit of Buyer or Sellers; (f) in connection with any enforcement of the terms of this Agreement. Notwithstanding the foregoing the Sellers permit Buyer to deliver letters to clients of the Business, in a form mutually agreed to by Sellers and Buyer, (i) a letter to all clients of each Seller countersigned by such Seller and Buyer including Buyer's information transferring accounts (and clients) from Seller to Buyer, (ii) a letter to all clients who pay Sellers by ACH countersigned by Seller and Buyer including Buyer's information and the new ACH information for said payments (and direction that any funds paid after the Closing Date shall be paid to Buyer) and (iii) a letter including specific instructions (preferably in a letter that can be given to clients) advising clients who to contact for trust fund monies belonging to said clients, each of which letters may be sent by Buyer at its sole discretion and cost on or after the Closing Date.

8.12 **Successors and Assigns**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns; provided that no party may assign any of its respective rights or obligations hereunder without the prior written consent of the

other parties hereto; except (i) the rights and interests of Sellers hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code and (ii) this Agreement may be assigned to any plan administrator or entity appointed as a successor to Sellers pursuant to a confirmed Chapter 11 plan.

8.13   **No Third Party Benefit**. Sellers and Buyer agree that the provisions of this Agreement are for the sole benefit of the parties hereto and their respective successors and permitted assigns, and are not for the benefit, directly or indirectly, of any other person or entity.

8.14   **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but together shall constitute one and the same document. The parties hereto agree that the delivery of this Agreement by facsimile or e-mail PDF bearing their respective signatures shall be sufficient and binding upon them as if such document were delivered with original signatures.

8.15   **Time is of the Essence.** Unless stated expressly to the contrary herein, time shall be of the essence for all events contemplated hereunder.

8.16   **Attorney's Fees.** Should any action be commenced between the parties hereto or their representatives and assigns concerning any provision of this Agreement, or the rights and duties of any person or entity hereunder, solely as between the parties hereto or their successors and assigns, the party or parties prevailing or substantially prevailing in such proceedings will be entitled to the reasonable attorney's fees and expenses of counsel and court costs incurred by reason of such actions.

8.17   **Entire Agreement**. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior agreements, representations and understandings of the parties. No addition to or modification of this Agreement shall be binding unless executed in writing by all of the parties. Except as may be otherwise provided in this Agreement, no waiver of any of the provisions of this Agreement shall be deemed, or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver and no waiver shall be binding unless evidenced by an instrument in writing executed by the party making the waiver.

[signatures continued next page]

IN WITNESS WHEREOF, the parties hereto have set forth their hands on the day and year first above-mentioned.

Sellers:

Cal-Western Reconveyance Corporation,
a California corporation

By: _____
Printed Name: _Daniel C. Weinstat_
Title: _CFO_

Reliable Reconveyance Corporation,
a California corporation

By: _____
Printed Name: _Daniel C. Weinstat_
Title: _CFO_

Interface Inc.,
a California corporation

By: _____
Printed Name: _Daniel C. Weinstat_
Title: _CFO_

Prommis Solutions, LLC,
a Delaware limited liability company

By: _____
Printed Name: _Daniel C. Weinstat_
Title: _CFO_

Buyer:

Cypress Innovations, Inc.,
a Nevada corporation

By: _____
Printed Name: _Robert H. Hbee_
Title: _President_

[ASSET PURCHASE AGREEMENT SIGNATURE PAGE]

# EXHIBIT "A-1"

### Assets of Cal

1)   All tangible personal property, including but not limited to all assets, properties, improvements and equipment, owned by Cal at the Premises;

2)   All intellectual property owned by Cal, wherever located;

3)   The AS 400 owned by Cal and located in the Chicago COLO facility; and

4)   The common law marks and other proprietary rights  held by Cal to the names "Cal Western Reconveyance Corporation" and any other similar names.

## EXHIBIT "A-2"

### Assets of Reliable

1)  All tangible personal property, including but not limited to all assets, properties, improvements and equipment, owned by Reliable at the Premises;

2)  All intellectual property owned by Reliable, wherever located; and

3)  The common law marks and other proprietary rights held by Reliable to the names "Reliable Reconveyance Corporation", "Reliable Posting and Publishing" and any other similar names.

## EXHIBIT "A-3"

### Assets of Interface

1) All tangible personal property, including but not limited to all assets, properties, improvements and equipment, owned by Interface at the Premises;

2) All intellectual property owned by Interface, wherever located; and

3) The common law marks and other proprietary rights held by Interface to the name "Interface, Inc." and any other similar names.

## EXHIBIT "B-1"

### Prommis Lease

[see attached]

**AIR COMMERCIAL REAL ESTATE ASSOCIATION**
**STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET**
(DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

1. **Basic Provisions ("Basic Provisions").**

1.1 **Parties:** This Lease ("Lease"), dated for reference purposes only November , 2007
is made by and between GERALD R. MOSS AND JUDY Y. MOSS, AS CO-TRUSTEES OF THE MOSS FAMILY TRUST UD
06/04/90 ("Lessor")
and MR PROCESSING HOLDING CORP., a Delaware corporation
("Lessee"),
(collectively the "Parties," or individually a "Party").

1.2 **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease,
and commonly known as 525 E. Main Street, El Cajon, CA 92020 .
located in the County of San Diego , State of California
and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project) real
property improved with an office building containing approximately 23,980 square feet of rentable area plus all
property enclosed within the two parking areas immediately behind (to the south) of the building which area
consists of 71 parking spaces in the eastern section and 19 parking spaces in the western section

 ("Premises"). (See also Paragraph 2)

1.3 **Term:** Five years and months ("Original Term") commencing November 14, 2007
("Commencement Date") and ending October 31, 2012 ("Expiration Date"). (See also Paragraph 3)

1.4 **Early Possession:** N/A ("Early Possession Date").
(See also Paragraphs 3.2 and 3.3)

1.5 **Base Rent:** $33,000 per month ("Base Rent"), payable on the first (1st) day of each month commencing with
the first (1st) day of the calendar month in the Term following the Commencement Date, with a partial
pro-rated payment for the period from the Commencement Date through the end of the month in which the
Commencement Date occurs due and payable on the Commencement Date. _____ . (See also Paragraph 4)
☐ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.

1.6 **Base Rent and Other Monies Paid Upon Execution:**
(b) Base Rent: $0.00 for the period N/A

(b) Security Deposit: $0.00 ("Security Deposit"). (See also Paragraph 5)
(c) Association Fees: $0.00 for the period N/A
(d) Other: $0.00 for N/A

(e) Total Due Upon Execution of this Lease: $0.00 .

1.7 **Agreed Use:** General office use and any other lawful use
. (See also Paragraph 6)

1.8 **Insuring Party:** Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

1.9 **Real Estate Brokers:** (See also Paragraph 15)
(a) **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check
applicable boxes):
☐ _____ represents Lessor exclusively ("Lessor's Broker");
☐ _____ represents Lessee exclusively ("Lessee's Broker"); or
☐ _____ represents both Lessor and Lessee ("Dual Agency").
(b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to
in their separate written agreement (or if there is no such agreement, the sum of N/A or N/A % of the total Base Rent)
for the brokerage services rendered by the Brokers.

1.10 **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by N/A
("Guarantor"). (See also Paragraph 37)

1.11 **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☐ an Addendum consisting of Paragraphs _____ through _____ ;
☐ a plot plan depicting the Premises;
☐ a current set of the Rules and Regulations;
☐ a Work Letter;
☐ other (specify): N/A

**PAGE 1 OF 18**

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-10-6/07E

2.    Premises.

   2.1    Letting. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less. Note: Lessee is advised to verify the actual size prior to executing this Lease.

   2.2    Condition. Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.

   2.3    Compliance. Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

      (a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

      (b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

      (c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

   2.4    Acknowledgements. Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, and (c) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

   2.5    Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-10-6/07E

work,.

3.    Term.

3.1    Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2    Early Possession.   If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and Insurance premiums and to maintain the Premises) shall be in effect during such period. Any such early possession shall not affect the Expiration Date.

3.3    Delay In Possession.   Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4    ·    Lessee Compliance. Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessee may elect to withhold possession until such conditions are satisfied.

4.    Rent.

4.1.    Rent Defined. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2    Payment.    Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

4.3    Association Fees. [Intentionally Omitted]In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.

5.    Security Deposit.   [Intentionally Omitted]Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due Lessor or to Rents which will be due in the future, and/or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.    Use.

6.1    Use. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor

PAGE 3 OF 18

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM SYN-18-6/07E

shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

    6.2    Hazardous Substances.

    (a) Reportable Uses Require Consent. The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

    (b) Duty to Inform Lessor. If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

    (c) Lessee Remediation. Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

    (d) Lessee Indemnification. Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent property not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

    (e) Lessor Indemnification. Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

    (f) Investigations and Remediations. Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

    (g) Lessor Termination Option. If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

    6.3    Lessee's Compliance with Applicable Requirements. Except as otherwise provided in this Lease, Lessee shall, at Lessee's

<div align="center">PAGE 4 OF 18</div>

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-10-5/07E

sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements, without regard to whether such Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4    Inspection; Compliance. Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor.

7.    Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.

7.1    Lessee's Obligations.

(a) In General. Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b) Service Contracts. Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) Failure to Perform. If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d) Replacement. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (i.e. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

7.2    Lessor's Obligations. Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    Utility Installations; Trade Fixtures; Alterations.

(a) Definitions. The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) Consent. Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect

INITIALS
_____

INITIALS
_____

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-10-5/07E

the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) Liens; Bonds. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4 Ownership; Removal; Surrender; and Restoration.

(a) Ownership. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) Surrender; Restoration. Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises, or if applicable, the Premises) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8. Insurance; Indemnity.

8.1 Payment For Insurance. Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease Term shall be prorated to correspond to the Lease Term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

8.2 Liability Insurance.

(a) Carried by Lessee. Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) Carried by Lessor. Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3 Property Insurance - Building, Improvements and Rental Value.

(a) Building and Improvements. The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-10-6/07E

more than the commercially reasonable and available insurable value thereof. If Lessor is the Insuring Party, however, Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4 rather than by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) Rental Value. The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) Adjacent Premises. If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4    Lessee's Property; Business Interruption Insurance.

(a) Property Damage. Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) Business Interruption. Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) No Representation of Adequate Coverage. Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5    Insurance Policies. Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6    Waiver of Subrogation. Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7    Indemnity. Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessee need not have first paid any such claim in order to be defended or indemnified.

8.8    Exemption of Lessor and its Agents from Liability. Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9    Failure to Provide Insurance. Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the

PAGE 7 OF 18

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                        FORM STN-18-6/07E

failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.   **Damage or Destruction.**

   9.1      **Definitions.**

      (a) "Premises Partial Damage" shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

      (b) "Premises Total Destruction" shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

      (c) "Insured Loss" shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

      (d) "Replacement Cost" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

      (e) "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises which requires repair, remediation, or restoration.

   9.2      **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

   9.3      **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

   9.4      **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

   9.5      **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

   9.6      **Abatement of Rent; Lessee's Remedies.**

      (a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-10-6/07E

damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value Insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) Remedies. If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7     Termination; Advance Payments. Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.     Real Property Taxes.
10.1     Definition. As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein; (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2     Payment of Taxes. In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date. If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent. Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which such installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3     Joint Assessment. If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4     Personal Property Taxes. Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.     Utilities and Services. Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.     Assignment and Subletting.
12.1     Lessor's Consent Required.
(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessee's prior written consent. Notwithstanding the foregoing, Lessee may, without Lessor's consent, sublet all or any portion of the Premises to one or more of Cal-Western Reconveyance Corporation, a California corporation, Reliable Reconveyance Corporation, a California corporation, and Rito Duncan LLP, a California based liability partnership. In addition, Lessee shall have the right to assign this Lease or sublet the Premises without Lessor's consent (i) to any corporation or other entity that controls, is controlled by or is under common control with Lessee (ii) to any corporation or other entity resulting from a merger, acquisition, consolidation or reorganization of or with Lessee or (iii) in connection with the sale of all or substantially all of the assets of Lessee.

~~(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.~~ Notwithstanding anything contained herein to the contrary, a direct or indirect assignment, sale, transfer, pledge or encumbrance of any stock or partnership, membership or other ownership interests, or voting rights of, in or otherwise with respect to Lessee shall not be deemed an assignment of this Lease and shall not require the prior consent of Lessor.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the

PAGE 9 OF 16

INITIALS                                                                                                   INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                          FORM STN-10-6/97E

time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, le. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2    Terms and Conditions Applicable to Assignment and Subletting.

(a) Regardless of Lessor's consent, no assignment or subletting shall:  (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    Additional Terms and Conditions Applicable to Subletting.  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attom to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    Default; Breach; Remedies.

13.1    Default; Breach.  A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease.  A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-10-6/07E

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    Remedies. If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which has been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding the unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    Inducement Recapture. Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no

PAGE 11 OF 18

further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4 **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5 **Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6 **Breach by Lessor.**

(a) **Notice of Breach.** Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14. Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15. Brokerage Fees.**

15.1 **Additional Commission.** [Intentionally Omitted] [In addition to the payments required pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.]

15.2 **Assumption of Obligations.** [Intentionally Omitted] [Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.]

15.3 **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred

<div align="center">PAGE 12 OF 18</div>

_____
**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

_____
**INITIALS**

**FORM STN-10-6/07E**

with respect thereto.

16. **Estoppel Certificates.**

(a) Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17. **Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18. **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19. **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20. **Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21. **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22. **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. *Without limiting the foregoing, this Lease extinguishes and supersedes that certain lease agreement dated May 15, 1994 between Lessor and Cal-Western Reconveyance Corporation.*

23. **Notices.**

23.1 **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2 **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24. **Waivers.**

(a) No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

requiring such consent.

(b)    The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)    THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.    **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)    When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)    Lessor's Agent. A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)    Lessee's Agent. An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)    Agent Representing Both Lessor and Lessee. A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b)    Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)    Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.    **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.    **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.    **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.    **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.    **Subordination; Attornment; Non-Disturbance.**

30.1    Subordination. This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2   Attornment. In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3   Non-Disturbance. With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4   Self-Executing. The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.   Attorneys' Fees. If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereinafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.   Lessor's Access; Showing Premises; Repairs. Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.   Auctions. Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.   Signs. Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.   Termination; Merger. Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.   Consents. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.   Guarantor. [Intentionally Omitted]
37.1   Execution. The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-10-6/07E

Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

~~37.2 Default. It shall constitute a Default of this Lease if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.~~

38. **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39. **Options.** [Intentionally Omitted] ~~If Lessee is granted an Option, as defined below, then the following provisions shall apply:~~

~~39.1 Definition. "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.~~

~~39.2 Options Personal To Original Lessee. Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.~~

~~39.3 Multiple Options. In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.~~

~~39.4 Effect of Default on Options.~~
~~(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.~~
~~(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).~~
~~(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) Lessee commits a Breach of this Lease.~~

40. **Multiple Buildings.** [Intentionally Omitted] ~~If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.~~

41. **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42. **Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43. **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment.

44. **Authority; Multiple Parties; Execution.**
(a) If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.
(b) If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.
(c) This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45. **Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

PAGE 16 OF 18

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-16-6/07E

46.    Offer.  Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.    Amendments.  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.    Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49.    Mediation and Arbitration of Disputes.  An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not  attached to this Lease.

50.    Americans with Disabilities Act.  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:

1.  SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.  RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING:  IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: _____ | Executed at: _____ |
| On: October    , 2007 | On: October    , 2007 |
| By LESSOR: | By LESSEE: |
| GERALD R. MOSS AND JUDY Y. MOSS, AS | HR PROCESSING HOLDING CORP. |
| CO-TRUSTEES OF THE MOSS FAMILY TRUST UDT | a Delaware corporation |
| 06/04/90 | |
| By: _____ | By: _____ |
| Name Printed: GERALD R. MOSS | Name Printed: _____ |
| Title: CO-TRUSTEE OF THE MOSS FAMILY TRUST UDT | Title: _____ |
| 06/04/90 | By: By: _____ |
| | Name Printed: _____ |
| Name Printed: JUDY Y. MOSS | Title: _____ |
| Title: CO-TRUSTEE OF THE MOSS FAMILY TRUST UDT | Address: _____ |
| 06/04/90 | |
| Address: _____ | Telephone:(___) _____ |
| | Facsimile:(___) _____ |
| | Federal ID No. _____ |
| Telephone:(___) _____ | |
| Facsimile:(___) _____ | |
| Federal ID No. _____ | |
| BROKER: | BROKER: |
| N/A | N/A |

PAGE 17 OF 18

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-16-8/07E

Attn: _____          Attn: _____
Title: _____          Title: _____
Address: _____          Address: _____
_____          _____
Telephone:( ___ ) _____           Telephone:( ___ ) _____
Facsimile:( ___ ) _____           Facsimile:( ___ ) _____
Federal ID No. _____           Federal ID No. _____

NOTICE: These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you are utilizing the most current form:  AIR Commercial Real Estate Association,  800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No. (213) 687-8777,  Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association.  All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

PAGE 18 OF 18

INITIALS                                        INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM STN-10-6/07E

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: _____ | Executed at: _____ |
| On: _____, 2007 | On: _____, 2007 |
| By LESSOR: | By LESSEE: |
| GERALD R. MOSS AND JUDY Y. MOSS, AS | MR PROCESSING HOLDING CORP. |
| CO-TRUSTEES OF THE MOSS FAMILY TRUST UDT | a Delaware corporation |
| 06/04/90 | |
| By: _____ | By: _____ |
| Name Printed: GERALD R. MOSS | Name Printed: _____ |
| Title: CO-TRUSTEE OF THE MOSS FAMILY TRUST UDT | Title: _____ |
| 06/04/90 | By: _____ |
| | Name Printed: _____ |
| Name Printed: JUDY Y. MOSS | Title: _____ |
| Title: CO-TRUSTEE OF THE MOSS FAMILY TRUST UDT | Address: _____ |
| 06/04/90 | |
| Address: _____ | Telephone:(___) _____ |
| | Facsimile:(___) _____ |
| Telephone:(___) _____ | Federal ID No. _____ |
| Facsimile:(___) _____ | |
| Federal ID No. _____ | |
| BROKER: | BROKER: |
| N/A | N/A |
| Attn: _____ | Attn: _____ |
| Title: _____ | Title: _____ |
| Address: _____ | Address: _____ |
| Telephone:(___) _____ | Telephone:(___) _____ |
| Facsimile:(___) _____ | Facsimile:(___) _____ |
| Federal ID No. _____ | Federal ID No. _____ |

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017, Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association. All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

INITIALS
©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION
INITIALS
FORM STN-10-8/07E

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| Executed at: | Executed at: |
|---|---|
| On: _November 14, 2007_ | On: _November 14, 2007_ |

By LESSOR:

GERALD R. MOSS AND JUDY Y. MOSS, AS
CO-TRUSTEES OF THE MOSS FAMILY TRUST UDT
06/04/90

By: _____
Name Printed: GERALD R. MOSS
Title: CO-TRUSTEE OF THE MOSS FAMILY TRUST UDT
06/04/90

Name Printed: JUDY Y. MOSS
Title: CO-TRUSTEE OF THE MOSS FAMILY TRUST UDT
06/04/90
Address: _____
_____
Telephone:(___) _____
Facsimile:(___) _____
Federal ID No. _____

By LESSEE:

MR PROCESSING HOLDING CORP.
a Delaware corporation

By: _____
Name Printed: _Jennifer Darris_
Title: _Vice President_
By: _____
Name Printed: _____
Title: _____
Address: _____
_____
Telephone:(___) _____
Facsimile:(___) _____
Federal ID No. _____

BROKER:
N/A

Attn: _____
Title: _____
Address: _____

Telephone:(___) _____
Facsimile:(___) _____
Federal ID No. _____

BROKER:
N/A

Attn: _____
Title: _____
Address: _____

Telephone:(___) _____
Facsimile:(___) _____
Federal ID No. _____

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

© Copyright 2001 – By AIR Commercial Real Estate Association. All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

PAGE 15 OF 15

INITIALS

©2001 – AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-10-6/07E



## FIRST   AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE is made and entered into as of __April 4, 2012__ , by and between STANLEY KRAMER, TRUSTEE OF THE KRAMER FAMILY TRUST ("Lessor") and ____PROMMIS SOLUTIONS HOLDING CORP. FKA MR PROCESSING HOLDING CORP.,__ a _Delaware_ corporation ("Lessee"); *LLC*

WHEREAS, on or about __November 14, 2007__ a Lease was entered into by and between the then Lessor, GERALD R. MOSS AND JUDY Y. MOSS, AS CO-TRUSTEES OF THE MOSS FAMILY TRUST UDT 06/04./90, Lessor and Lessee relating to certain real property commonly known as: 525 E. Main Street, El Cajon, CA 92020 ____ (the "Premises"). Said property is currently occupied by Prommis Solutions Holding Corp. fka MR Processing Holding Corp., hereinafter referred to as Lessee, under the aforementioned Lease. The rent is being paid by Cal-Western Reconveyance Corporation, hereinafter referred to jointly as Lessee. Current owner of the property is Stanley Kramer, hereinafter referred to as Lessor. ~,and~

WHEREAS, Lessor and Lessee ☐ have ☑ have not previously amended said Lease, and

WHEREAS, the Lessor and Lessee now desire to amend said Lease,

NOW, THEREFORE, ~for payment of TEN DOLLARS and other~ with good and valuable consideration to Lessor, the receipt and sufficiency of which is hereby acknowledged, the parties mutually agree to make the following additions and modifications to the Lease:

☑  TERM: The Expiration Date is hereby ☐ advanced ☑ extended for one year beginning November 1, 2012 to October 31, 2013. _____.

☐  AGREED USE: The Agreed Use is hereby modified to: _____

☑  BASE RENT ADJUSTMENT: Monthly Base Rent shall be as follows: The Base Rent shall be One Dollar and Twenty cents ($1.20) per Rentable Square Footage (RSF) NET, NET, NET (NNN). The agreed upon RSF is 23,980 square feet. The Base Rent shall become effective May 1, 2012.

☑  OTHER: RENT INCREASE: The Base Rent shall increase by 3% on November 1, 2012. _____

This Agreement shall not be construed against the party preparing it, but shall be construed as if all parties jointly prepared this Agreement and any uncertainty and ambiguity shall not be interpreted against any one party.

All other terms and conditions of this Lease shall remain unchanged and shall continue in full force and effect except as specifically amended herein.

EXECUTED as of the day and year first above written.

| By Lessor: | By Lessee: |
|---|---|
| STANLEY KRAMER, | PROMMIS SOLUTIONS HOLDING CORP. FKA MR PRO~ |
| TRUSTEE OF THE KRAMER FAMILY TRUST | CESSING HOLDING CORP., a Delaware corporation |
| By: *Stanley Kramer* | By: *Michelle H. Ansley* |
| Name Printed: STANLEY KRAMER    4/9/12 | Name Printed: *Michelle Ansley* 4/12/12 |
| Title: | Title: SVP HR Shared Services |
| By: | By: |
| Name Printed: | Name Printed: |
| Title: | Title: |

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017.

INITIALS

PAGE 1 OF 2

INITIALS

©2006 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM ATL-0-7/08E

## ASSIGNMENT OF LEASE

This Assignment of Lease (this "Assignment") is made and entered into as of May 1, 2012, by and between Prommis Solutions Holding Corp. (f/k/a MR Processing Holding Corp.), a Delaware corporation ("Assignor") and Prommis Solutions, LLC, a Delaware limited liability company and wholly-owned subsidiary of Assignor ("Assignee").

WHEREAS, Assignor is party to that certain lease dated as of November 14, 2007 with Gerald R. Moss and Judy Y. Moss, as Co-Trustees of the Moss Family Trust UDT 06/04/90 (the "Lease") relating to certain real property commonly known as 525 E. Main Street, El Cajon, CA 92020 (the "Premises");

WHEREAS, Assignor is party to that certain First Amendment to Lease with Stanley Kramer, Trustee of the Kramer Family Trust, dated as of April 4, 2012 (the "Amendment");

WHEREAS, Assignor is a holding corporation with no operations or employees and the Premises is occupied by Assignee and its wholly-owned subsidiary, Cal-Western Reconveyance Corporation, a California corporation;

WHEREAS, pursuant to Section 12.1(a) of the Lease, Assignor has the right to assign the Lease without lessor's consent to any corporation or other entity that controls, is controlled by, or is under common control with Assignor; and

WHEREAS, Assignee is a wholly-owned subsidiary of Assignor, and, accordingly, controlled by Assignor; and

WHEREAS, Assignor wishes to assign, and Assignee wishes to accept, the Lease and the Amendment on the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the covenants in this Assignment, and for other good and valuable consideration, the receipt and sufficiency of which Assignor and Assignee hereby acknowledge, Assignor and Assignee agree as follows:

1. Assignment and Assumption. Pursuant to its rights under Section 12.1(a) of the Lease, Assignor hereby unconditionally assigns and transfers to Assignee, its wholly owned subsidiary, a good and valid leasehold interest in the Premises under the Lease, as amended by the Amendment, and all of Assignor's other rights, title and interest in and to the Lease, as amended by the Amendment (including, without limitation, Assignor's rights to, and interests in, any security deposit held by the lessor under the Lease). Assignee hereby unconditionally accepts such assignment and transfer and assumes all obligations of the tenant under the Lease, as amended by the Amendment.

2. Miscellaneous. This Assignment may be modified only by a written instrument executed by both Assignor and Assignee. This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors, including, without limitation, to the extent permitted under the Lease, any assignee succeeding to Assignee's rights, title and interest in and to the Premises.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first set forth above.

Assignor:
PROMMIS SOLUTIONS HOLDING CORP.

By: _____
Name: Michelle Ansley
Title: Senior Vice President, Shared Services

Assignee:
PROMMIS SOLUTIONS, LLC

By: _____
Name: Michelle Ansley
Title: Senior Vice President, Shared Services

**EXHIBIT "B-2"**

**Interface Lease**

[see attached]



## STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET
### AIR COMMERCIAL REAL ESTATE ASSOCIATION

1. **Basic Provisions ("Basic Provisions").**

1.1 **Parties:** This Lease ("Lease"), dated for reference purposes only **October 1, 2008**
is made by and between **Seacliff Ponderosa LLC, a California limited liability company**

_____ **("Lessor")**

and **Interface, Inc., a Promais Solutions Company, a California corporation**

_____

_____ ("Lessee"), (collectively the "Parties", or individually a "Party").

1.2(a) **Premises:** That certain portion of the Project (as defined below), including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known by the street address of **4241 Ponderosa Avenue, Suite G**
located in the City of **San Diego** , County of **San Diego** , State of
**California** , with zip code **92123** , as outlined on Exhibit _____ , attached hereto ("Premises")
and generally described as (describe briefly the nature of the Premises): **consists of approximately 6,100 rentable square feet of space**

In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the any utility raceways of the building containing the Premises (" Building") and to the common Areas (as defined in Paragraph 2.7 below), but shall not have any rights to the roof or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." (See also Paragraph 2)

1.2(b) **Parking:** **Twenty (20)** unreserved vehicle parking spaces. (See also Paragraph 2.6)

1.3 **Term:** **Three (3)** years and **Zero (0)** months ("Original Term")
commencing **January 1, 2009** ("Commencement Date") and ending **December 31, 2011**
("Expiration Date"). (See also Paragraph 3)

1.4 **Early Possession:** **November 1, 2008** ("Early Possession Date").
(See also Paragraphs 3.2 and 3.3)

1.5 **Base Rent:** $ **7,015.00** per month ("Base Rent"), payable on the **first**
day of each month commencing **January 1, 2009** . (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph

1.6 **Lessee's Share of Common Area Operating Expenses:** **Three and ninety-two hundredths** percent
**(3.92 %) ("Lessee's Share").** Lessee's Share has been calculated by dividing the approximate square footage of the Premises by the approximate square footage of the Project. In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

1.7 **Base Rent and Other Monies Paid Upon Execution:**

(a) Base Rent: $ **7,015.00** for the period **January 1-31, 2009**

(b) Common Area Operating Expenses: $ **1,952.00** for the period **January 1-31, 2009**

(c) Security Deposit: $ **7,442.21** ("Security Deposit"). (See also Paragraph 5)

(d) Other: $ **0.00** for _____

(e) Total Due Upon Execution of this Lease: $ **16,409.21**

1.8 **Agreed Use:** **General office and warehouse for printing/sorting/mailing company**

_____ (See also Paragraph 6)

1.9 **Insuring Party.** Lessor is the "Insuring Party". (See also Paragraph 8)

1.10 **Real Estate Brokers:** (See also Paragraph 15)

(a) **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☑ **Cushman & Wakefield of San Diego, Inc.** represents Lessor exclusively ("Lessor's Broker"); ☒

☑ **Newburger-Andes & Co.** represents Lessee exclusively ("Lessee's Broker"); or

☐ _____ represents both Lessor and Lessee ("Dual Agency").

(b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent for the brokerage services rendered by the Brokers).

1.11 **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by **Promais Solutions Holding Corp.** ("Guarantor"). (See also Paragraph 37)

1.12 **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs **50** through **53** ;

☑ a site plan depicting the Premises;

☑ a site plan depicting the Project;

☐ a current set of the Rules and Regulations for the Project;

☐ a current set of the Rules and Regulations adopted by the owners' association;

**PAGE 1 OF 17**

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-8/97E

☐ a Work Letter;

☐ other (specify):_____

---

**2.    Premises.**

    **2.1    Letting.** Lessor hereby leases to Lessee, and Lessee hereby rents from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less.  NOTE: Lessee is advised to verify the actual size prior to executing this Lease.

    **2.2    {See Addendum} Condition.** Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Unit does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Unit. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, roof, foundations, and/or bearing walls - see Paragraph 7).

    **2.3    Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises and the Common Areas comply with the building codes that were in effect at the time that each such improvement, or portion thereof, was constructed, and also with all applicable laws, covenants or restrictions of record, regulations, and ordinances in effect on the Start Date ("Applicable Requirements"). Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements and especially the zoning are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed .  If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense.  If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.  If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

      (a)    Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

      (b)    If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

      (c)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements.  If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

    **2.4    Acknowledgements.** Lessee acknowledges that:  (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental  aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, and (c) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

    **2.5    Lessee as Prior Owner/Occupant.** The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises.  In such event, Lessee shall be responsible for any necessary corrective work.

    **2.6    Vehicle Parking.** Lessee shall be entitled to use the number of parking spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking. Lessee shall not use more parking spaces than said number. Said parking spaces shall be used for parking by vehicles no larger then full-size passenger automobiles or pick-up trucks, herein called "Permitted Size Vehicles."

INITIALS                                       INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM MTN-7-6/07E

Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9.  No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Lessor. In addition:

    (a)    Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

    (b)    Lessee shall not service or store any vehicles in the Common Areas.

    (c)    If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

    **2.7**    **Common Areas - Definition.**  The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

    **2.8**    **Common Areas - Lessee's Rights.**  Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project.  Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas.  Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time.  In the event that any unauthorized storage shall occur then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

    **2.9**    **Common Areas - Rules and Regulations.**  Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("Rules and Regulations") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees.  Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform.  Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

    **2.10**    **Common Areas - Changes.**  Lessor shall have the right, in Lessor's sole discretion, from time to time:

    (a)    To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

    (b)    To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

    (c)    To designate other land outside the boundaries of the Project to be a part of the Common Areas;

    (d)    To add additional buildings and improvements to the Common Areas;

    (e)    To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

    (f)    To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

**3.**    **Term.**

    **3.1**    **Term.**  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

    **3.2**    **Early Possession.**  If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession.  All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period.  Any such early possession shall not affect the Expiration Date.

    **3.3**    **Delay In Possession.**  Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date.  If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date.  Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of the delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed, but minus any days of delay caused by the acts or omissions of Lessee.  If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder.  If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate.  Except as otherwise provided, if possession is not tendered to Lessee by the Start Date and Lessee does not terminate this Lease, as aforesaid, any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee.  If possession of the Premises is not delivered within 4 months after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

    **3.4**    **Lessee Compliance.**  Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5).  Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance.  Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.**    **Rent.**

    **4.1**    **Rent Defined.**  All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

    **4.2**    **Common Area Operating Expenses.**  Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

    (a)    "Common Area Operating Expenses" are defined, for purposes of this Lease, as all costs incurred by Lessor relating

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-6/07E

to the ownership and operation of the Project, including, but not limited to, the following:

    (i)    The operation, repair and maintenance, in neat, clean, good order and condition , and if necessary the replacement, of the following:

    (aa)    The Common Areas and Common Area Improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, and roof drainage systems.

    (bb)    Exterior signs and any tenant directories.

    (cc)    Any fire sprinkler systems.

    (ii)    The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

    (iii)    The cost of trash disposal, pest control services, property management, security services, owners' association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

    (iv)    Reserves set aside for maintenance, repair and/or replacement of Common Area Improvements and equipment.

    (v)    Real Property Taxes (as defined in Paragraph 10).

    (vi)    The cost of the premiums for the insurance maintained by Lessor pursuant to Paragraph 8.

    (vii)    Any deductible portion of an insured loss concerning the Building or the Common Areas.

    (viii)    Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

    (ix)    The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month.

    (x)    The cost of any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

    (b)    Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building, or other building. However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

    (c)    The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(e) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

    (d)    Lessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the annual Common Area Operating Expenses. Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses incurred during the preceding year. If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over-payment against Lessee's future payments. If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

    (e)    Common Area Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

    4.3    Payment. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check to stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

**5.**    **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under the Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due already due Lessor, for Rents which will be due in the future, and/or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

**6.**    **Use. (See Addendum)**

    6.1    **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the Building or the mechanical or

INITIALS

© 1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-8/07E

electrical systems therein, and/or is not significantly more burdensome to the Project.  If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2     Hazardous Substances.

(a)     Reportable Uses Require Consent.  The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory.  Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof.  Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements.  "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties.  Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor.  In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)     Duty to Inform Lessor.  If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)     Lessee Remediation.  Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)     Lessee Indemnification.  Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee).  Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.  No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)     Lessor Indemnification.  Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which are suffered as a direct result of Hazardous Substances on the Premises prior to Lessee taking possession or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees.  Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)     Investigations and Remediations.  Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Lessee taking possession, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment.  Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)     Lessor Termination Option.  If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13). Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.  In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment.  In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available.  If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3     Lessee's Compliance with Applicable Requirements.  Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate to any manner to such Requirements, without regard to whether said Requirements are now in effect or become effective after the Start Date.  Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the

_____
INITIALS

©1999 · AIR COMMERCIAL REAL ESTATE ASSOCIATION

_____
INITIALS

FORM MTN-7-8/07E

Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4    **Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of written request therefor.

7.     **Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations .**

7.1    **Lessee's Obligations.** (See Addenda)

(a)    **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligation shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b)    **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler and pressure vessels, and (iii) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)    **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)    ~~Replacement. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall pay Lessee's share only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.~~

7.2    **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and Utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2. Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Lessee expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    **Utility Installations; Trade Fixtures; Alterations .**

(a)    **Definitions.** The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)    **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)    **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialsmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-6/07E

may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4     Ownership; Removal; Surrender; and Restoration.

(a)     **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)     **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)     **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the Improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Project) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.      Insurance; Indemnity.

8.1     **Payment of Premiums.** The cost of the premiums for the insurance policies required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(e) and 8.3(b), shall be a Common Area Operating Expense. Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2     **Liability Insurance.**

(a)     **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an " insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)     **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3     **Property Insurance - Building, Improvements and Rental Value.**

(a)     **Building and Improvements.** Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence.

(b)     **Rental Value.** Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days (" Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c)     **Adjacent Premises.** Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d)     **Lessee's Improvements.** Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4     Lessee's Property; Business Interruption Insurance.

(a)     **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b)     **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c)     **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of

INITIALS

(INITIALS)

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM MTN-7-4/07E

OCT-10-2008  04:46                                                                 P.008

insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5    **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6    **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7    **Indemnity.** (See Addendum) Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8    **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9    **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.    **Damage or Destruction.**

9.1    Definitions. (See Addendum)

(a)    **"Premises Partial Damage"** shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b)    **"Premises Total Destruction"** shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c)    **"Insured Loss"** shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)    **"Replacement Cost"** shall mean the cost to repair or rebuild the Improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)    **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2    **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and

PAGE 8 OF 17

**INITIALS**

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

**INITIALS**

FORM MTN-7-6/07E

effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3     Partial Damage - Uninsured Loss.  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4     Total Destruction.  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5     Damage Near End of Term.  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6     Abatement of Rent; Lessee's Remedies.

(a)     Abatement.  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)     Remedies.  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7     Termination; Advance Payments.  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.8     (See Addendum)

10.     Real Property Taxes.

10.1     Definition.  As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address and where the proceeds are so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Project is located. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease. In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.

10.2     Payment of Taxes.  Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3     Additional Improvements.  Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and tax sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees. Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.4     Joint Assessment.  If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.  Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5     Personal Property Taxes.  Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-4/07E

properly to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.        Utilities and Services.  Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon.  Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the trash receptacle and/or an increase in the number of times per month that it is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs.  There shall be no abatement of Rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.        Assignment and Subletting.

12.1        Lessor's Consent Required.

(a)        Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)        Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent.  The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)        The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent.  "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)        An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period.  If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect.  Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)        Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f)        Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g)        Notwithstanding the foregoing, allowing a de minimis portion of the Premises, i.e. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2        Terms and Conditions Applicable to Assignment and Subletting.

(a)        Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)        Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment.  Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c)        Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d)        In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of the Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefore to Lessor, or any security held by Lessor.

(e)        Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f)        Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g)        Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3        Additional Terms and Conditions Applicable to Subletting . The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)        Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any abligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)        In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-8/97E

Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)     Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)     No sublease shall further assign or sublet all or any part of the Premises without Lessor's prior written consent

(e)     Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

12.4     Assignment and Subletting (See Addendum)

13.     Default; Breach; Remedies.

13.1     Default; Breach. A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under the Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)     The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)     (See Addendum) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c)     The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d)     The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material data safety sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)     A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)     The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)     The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)     If the performance of Lessee's obligations under this Lease is guaranteed:  (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2     Remedies. If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)     Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee:  (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

INITIALS

INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-7-8/07E

(b)  Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)  Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    Inducement Recapture.  Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges.  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 6 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest.  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payments, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ( "Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    Breach by Lessee. [See Addendum]

(a)  Notice of Breach.  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b)  Performance by Lessee on Behalf of Lessor.  In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    Condemnation.  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the floor area of the Unit, or more than 25% of the parking spaces is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease as aforesaid, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

~~15    Brokerage Fees.  [See Addendum]~~

~~15.1    Additional Commissions.  In addition to the payments owed pursuant to Paragraph 1.10 above, and unless Lessor and the Broker otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Broker a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.~~

~~15.2    Assumption of Obligations.  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessor's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.~~

~~15.3    Representations and Indemnities of Broker Relationships.  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder~~

PAGE 12 OF 17

INITIALS
©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                                          FORM MTN-7-8/07E
INITIALS

or other similar party by reason of any dealings or actions of the Indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect therein.

**16.**　　**Estoppel Certificates.**

　　(a)　　Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

　　(b)　　If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

　　(c)　　If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

　　16.1　　Tenancy Statement. (See Addendum)

　　16.2　　Furnishing of Financial Statements; Lessee's Representations (See Addendum)

**17.**　　**Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18.**　　**Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.**　　**Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

**20.**　　**Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21.**　　**Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22.**　　**No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

**23.**　　**Notices.** (See Addendum)

　　23.1 Notice Requirements. All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

　　23.2 Date of Notice. Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

**24.**　　**Waivers.**

　　(a)　　No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

　　(b)　　The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

　　(c)　　THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

**25.**　　**Disclosures Regarding The Nature of a Real Estate Agency Relationship .**

　　(a)　　When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

　　(i)　　Lessor's Agent. A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-4/07E

dealings with the Lessor.  **To the Lessee and the Lessor:** (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)    **Lessee's Agent.**  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations.  **To the Lessee:** A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  **To the Lessee and the Lessor:** (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)    **Agent Representing Both Lessor and Lessee.**  A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.

(b)    Brokers have no responsibility with respect to any Default or Breach hereof by eitherParty.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)    Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

25.    ~~No Right To Holdover.~~  (See Addendum)  ~~Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds-over, than the Base-Rent shall be increased to 150% of the Base-Rent applicable immediately preceding the expiration or termination.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.~~

26.    **Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

27.    **Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

28.    **Binding Effect; Choice of Law.**  This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

29.    **Subordination; Attornment; Non-Disturbance** .

30.1    **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2    **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3    **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises.  Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises.  In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate the execution and delivery of a Non-Disturbance Agreement.

30.4    **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    **Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees.  Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment.  The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense.

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-7-8/07 E

The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.        Lessor's Access; Showing Premises; Repairs.  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises.  All such activities shall be without abatement of rent or liability to Lessee.

33.        Auctions.  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.        Signs.  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof.  Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.        Termination; Merger.  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies.  Lessor's failure to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.        Consents.  Except as otherwise provided herein, wherever in this Lease the consent of a Party is required for an act by or for the other Party, such consent shall not be unreasonably withheld or delayed.  Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor.  Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent.  The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given.  In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.        Guarantor.

    37.1        Execution.  The Guarantors, if any, shall each execute a Guarantee of Lease attached to the Lease, ~~generally in the form most recently published by the AIR Commercial Real Estate Association.~~

    37.2        Default.  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide:  (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.        Quiet Possession.  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.        Options.  If Lessee is granted an option, as defined below, then the following provisions shall apply.

    39.1        Definition.  "Option" shall mean:  (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

    39.2        Options Personal To Original Lessee.  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

    39.3        Multiple Options.  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

    39.4        Effect of Default on Options.

        (a)        Lessee shall have no right to exercise an Option:  (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

        (b)        The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

        (c)        An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof),or (ii) if Lessee commits a Breach of this Lease.

40.        Security Measures.  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same.  Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

41.        Reservations.  Lessor reserves the right (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

42.        Performance Under Protest.  .  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.  A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

PAGE 15 OF 17

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-8/07E

43. **Authority; Multiple Parties; Execution.**

(a) If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b) If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c) This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

44. **Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

45. **Offer.** Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

46. **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

47. **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

48. **Mediation and Arbitration of Disputes.** An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not attached to this Lease.

49. **Americans with Disabilities Act.** Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: _____  Executed at: _____
On: _____           On: _____
By LESSOR:                             By LESSEE:
Seacliff Ponderosa LLC, a California limited   Interface, Inc., a Prommis Solutions
liability company                      Company, a California corporation

By: _____           By: _____
Name Printed: Richard S. Hambleton, Jr.   Name Printed: _____
Title: Special Trustee of the Steadfast Family   Title: _____
Trust Dated December 11, 1996, its Manager

By: _____           By: _____
Name Printed: _____   Name Printed: _____
Title: _____         Title: _____
Address: _____       Address: _____

                                       Telephone:(    )
Telephone:(    )                       Facsimile:(    )
Facsimile:(    )                       Federal ID No.
Federal ID No.

BROKER:                                BROKER:
Cushman & Wakefield of San Diego, Inc.   Newburger-Andes & Co.

Attn: James Duncan                     Attn: David Andes
Title: Associate Director              Title: Vice President
Address: 4435 Eastgate Mall, Suite 200   Address: 201 Allen Road NE, Suite 30
San Diego, CA 92121                    Atlanta, GA 30328
Telephone: (858) 452-6500              Telephone: (404) 256-3061
Facsimile: (858) 452-3206              Facsimile: (404) 252-0055
Email: james.duncan@cushwake.com       Email: dandes@newburger-andes.com
Federal ID No. _____   Federal ID No. _____

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you

                    PAGE 16 OF 17

INITIALS                               INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                 FORM MTN-7-8/97E

OCT-10-2008  04:46

are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017.
Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

©Copyright 1989 By AIR Commercial Real Estate Association.
All rights reserved. No part of these works may be reproduced in any form without permission in writing.

INITIALS

©1989 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-7-6/97E



## RENT ADJUSTMENT(S)
### STANDARD LEASE ADDENDUM

**Dated** _____ September 30, 2008 _____

**By and Between (Lessor)** Seacliff Ponderosa, LLC, a California limited
liability company

**(Lessee)** Interface, Inc., a Prommis Solutions Company, a
California corporation

**Address of Premises:** 4241 Ponderosa Avenue, Suite G
San Diego, CA 92123

Paragraph ___50___

A.    RENT ADJUSTMENTS:

The monthly rent for each month of the adjustment period(s) specified below shall be increased using the method(s) indicated below:
(Check Method(s) to be Used and Fill in Appropriately)

☒  I.    Cost-of-Living Adjustment(s) (COLA)

a.    On (Fill in COLA Dates):

the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area).

_____ - All Items

(1982-1984 = 100), herein referred to as "CPI".

b.    The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): the ☐ first month of the term of this Lease as set forth in paragraph 1.3 (Base Month") or ☐ (Fill in Other "Base Month")._____. The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly rent be less than the rent payable for the month immediately preceding the rent adjustment.

c.    In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the Index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☒  II.    Market Rental Value Adjustment(s) (MRV)

a.    On (Fill in MRV Adjustment Date(s):

the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1) Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon whether new MRV will be on the adjustment date. If agreement cannot be reached within thirty days, then:

(i) Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days. Any associated costs will be split equally between the Parties, or

(ii) Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

(I) Within 15 days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant") check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(II) The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

_____                                PAGE 1 OF 2                                _____
INITIALS                                                                               INITIALS

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                              FORM RA-8.4/00E

(iii) If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, i.e., the one that is NOT the closest to the actual MRV.

2) Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b. Upon the establishment of each New Market Rental Value:
1) the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and -
2) the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☑ III.  Fixed Rental Adjustment(s) (FRA)

The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| January 1, 2010 | $7,225.45 |
| January 1, 2011 | $7,442.21 |
| | |
| | |
| | |
| | |
| | |
| | |

B.      NOTICE:
Unless specified otherwise herein, notice of any such adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C.      BROKER'S FEE:
The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 8th Street, Suite 800, Los Angeles, CA 90017.
Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

PAGE 2 OF 2

_____
INITIALS



INITIALS

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM RA-3-8/00E

OCT-10-2008  04:46                                                                    P.020



# OPTION(S) TO EXTEND
## STANDARD LEASE ADDENDUM

**Dated** _____ September 30, 2008 _____

**By and Between (Lessor)** Seacliff Ponderosa, LLC, a California limited

liability company

**By and Between (Lessee)** Interface, Inc., a Prommis Solutions

Company, a California corporation

**Address of Premises:** 4241 Ponderosa Avenue, Suite G

San Diego, CA 92123

Paragraph 51

**A.   OPTION(S) TO EXTEND:**
Lessor hereby grants to Lessee the option to extend the term of this Lease for 1 _____ additional 60 _____
month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

(i)   In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at
least 6 ____ but not more than 12 ____ months prior to the date that the option period would commence, time being of the essence.  If proper
notification of the exercise of an option is not given and/or received, such option shall automatically expire.  Options (if there are more than one) may
only be exercised consecutively.

(ii)   The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of
this Option.

(iii)   Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease
except where specifically modified by this option shall apply.

(iv)   This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only
while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

(v)   The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below:
(Check Method(s) to be Used and Fill In Appropriately)

☐ I. ~~Cost-of-Living-Adjustment(s) (COLA)~~
~~a.   On (Fill in COLA Dates):~~

~~The Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor~~
~~Statistics of the U.S. Department of Labor for (select one):  ☐ CPI W (Urban Wage Earners and Clerical Workers) or  ☐ CPI U (All Urban Consumers),~~
~~for (Fill in Urban Area):~~

~~All items (1982-1984 = 100), herein referred to as "CPI".~~

~~b.   The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in~~
~~paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to~~
~~the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the cal-~~
~~endar month which is 2 months prior to (select one):  ☐ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or  ☐~~
~~(Fill in Other "Base Month"):~~

~~The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly rent be less than the rent payable~~
~~for the month immediately preceding the rent adjustment.~~

~~c.   In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or~~
~~shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation.  In the event that the Parties cannot~~
~~agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then-~~
~~rules of said Association and the decision of the arbitrators shall be binding upon the parties.  The cost of said Arbitration shall be paid equally by the~~
~~Parties.~~

☒ II.   Market Rental Value Adjustment(s) (MRV)
a.   On (Fill in MRV Adjustment Date(s)): January 1, 2012

the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:
1) Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new
MRV will be on the adjustment date.  If agreement cannot be reached, within thirty days, then:

(a)  Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30
days.  Any associated costs will be split equally between the Parties, or

(b)  Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in

PAGE 1 OF 2

_____
INITIALS

_____
INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                    FORM OE-3-8/09E

writing, to arbitration in accordance with the following provisions:

(i) Within 15 days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" – check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(ii) The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to whether the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

(iii) If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

2) Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b.   Upon the establishment of each New Market Rental Value:

1) the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and
2) the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☐   III.   Fixed Rental Adjustment(s) (FRA)
The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

B.   NOTICE:
Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C.   BROKER'S FEE:
The Broker shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No.: (213) 687-8777.  Fax No.: (213) 687-8616.

INITIALS                                                                                          INITIALS

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OE-3-8/00E

ADDENDUM TO STANDARD INDUSTRIAL/COMMERCIAL
MULTI-TENANT LEASE - NET DATED, OCTOBER 1, 2008
BY AND BETWEEN
SEACLIFF PONDEROSA, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY
("Lessor")
AND
INTERFACE, INC. A PROMMIS SOLUTIONS COPMANY, A CALIFORNIA
CORPORATION ("Lessee")

THIS ADDENDUM TO STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE-NET ("Addendum") is made and entered into by and between Seacliff Ponderosa, LLC, a California limited liability company ("Lessor"), and Interface, Inc, a Prommis Solutions Company, a California corporation. ("Lessee"), as of the date set forth on the first page of that certain Standard Industrial/Commercial Single-Tenant Lease - Net (the "Lease Form") between Lessor and Lessee to which this Addendum is attached and incorporated. The terms, covenants and conditions set forth herein are intended to and shall have the same force and effect as if set forth at length in the body of the Lease Form. Paragraph number references in this Addendum are intended to track the corresponding paragraph numbers of the Lease Form, except as otherwise noted. To the extent the provisions of this Addendum are inconsistent with any provisions of the Lease Form, the provisions of this Addendum shall supersede and control. As used herein the term "Lease" shall mean the Lease Form, this Addendum, the Rent Adjustment(s) Addendum and the Option(s) to Extend Addendum, of even date herewith.

2.2     Condition of Premises. Lessee acknowledges the Premises are in satisfactory condition and expressly accepts the Premises in their "as-is" "where-is" condition, with all faults. Lessee further acknowledges that neither Lessor nor any agent of Lessor has made any representation or warranty with respect to the Premises or its suitability for the conduct of Lessee's business therein.

7.1(a) Lessee's Repair and Maintenance Obligations. All repairs and maintenance of the Premises by Lessee as required under the Lease shall be performed in a first class manner by contractors and other personnel reasonably approved by Lessor, shall be performed in accordance with a repair and maintenance plan reasonably approved by Lessor, and shall comply with guidelines and shall meet such standards of quality as may be reasonably established by Lessor from time to time during the Term, including, without limitation, providing Lessor with copies of all permits obtained by Lessee and "as-built" drawings of such work performed by Lessee.

8.2(a) Lessee's Insurance. The following shall be added to the end of Paragraph 8.2(a) of the Lease:

        "Lessee agrees to maintain in full force and effect at all times during the term of this Lease, as it may be extended, at its own expense, for the protection of Lessee and Lessor, as their interests may appear, policies of insurance issued by a reasonable carrier or carriers acceptable to Lessor which afford the following coverages: (i) workers' compensation: statutory limits; and (ii) employer's liability: as required by law.

        In the event that Lessee fails to obtain and maintain any insurance required under the Lease for any reason whatsoever, such failure shall constitute a material default by Lessee under this Lease and Lessee shall be conclusively deemed to have self-insured such insurance obligations with the full waiver of subrogation set forth in the Lease."

8.7     Indemnity. The provisions of this Paragraph 8.7 shall survive the expiration or earlier termination of this Lease with respect to claims, damages or liability arising or accruing during the term hereof.

9.8     Damage and Destruction. Notwithstanding anything to the contrary set forth in Paragraph 9 of the Lease, Lessee hereby waives the provisions of California Civil Code Sections 1932 and 1933, and any successor sections and any other statutes which are inconsistent with the



provisions of the Lease and which relate to the termination of leases when leased property is destroyed, and agree that such event shall be governed by the terms of the Lease.

    12.4   _Assignment and Subletting._ Notwithstanding anything to the contrary contained in Paragraph 12 of the Lease, one hundred percent (100%) of any sums or other economic consideration received by Lessee as a result of any assignment or subletting entered into pursuant to Paragraph 12 of the Lease, however denominated under the assignment or sublease, which exceed, in the aggregate (a) the total sums which Lessee is obligated to pay Lessor under this Lease (prorated to reflect obligations allocable to any portion of the Premises subleased), plus (b)(i) any real estate brokerage commissions or fees payable by Lessee in connection with such assignment or subletting (ii) costs of tenant improvements required to be constructed by Lessee for any such assignee or subtenant, and (iii) other reasonable costs incurred by Lessee in connection with any such assignment or subletting (including without limitation attorneys' fees), shall be paid to Lessor as additional rent under this Lease without affecting or reducing any other obligations of Lessee hereunder.  Lessee understands, acknowledges and agrees that Lessor's right to recapture any consideration paid in connection with an approved assignment or subletting is a material inducement for Lessor's agreement to lease the Premises to Lessee upon the terms and conditions set forth herein.

    13.1(b)  Default/Breach.  A notice give pursuant to this provision shall be in lieu of and not in addition to any notice required under _California Code of Civil Procedure_ section 1161 _et seq._ for purposes of an unlawful detainer action.

    15.    _Brokers._ Paragraph 15 of the Lease is deleted in its entirety and replaced with the following:  Lessee warrants and represents that Lessee has not dealt with any real estate broker or agent in connection with the Lease or its negotiation.  Lessee shall indemnify and hold Lessor and the Premises harmless from and against any and all costs, expenses and liability (including actual attorneys' fees and court costs) for any compensation, commission or fees claimed by any other real estate broker or agent in connection with the Lease or its negotiation based upon any act of Lessee.  Lessor warrants and represents to Lessee that Lessor has not dealt with any real estate broker or agent in connection with the Lease or its negotiation.  Lessor shall indemnify and hold Lessee harmless from and against any and all costs, expenses and liability (including actual attorneys' fees and court costs) for any compensation, commission or fees claimed by any other real estate broker or agent in connection with the Lease or its negotiation based upon any act of Lessor.

    16.1   _Tenancy Statement._ Lessee shall, at any time within ten (10) days after written notice from Lessor, execute, acknowledge, and deliver to Lessor a statement in writing in the form provided to Lessee by Lessor, plus such additional information, confirmation and/or statement as may reasonably be requested by Lessor.

    16.2.  _Furnishing of Financial Statement; Lessee's Representations._  In order to induce Lessor to enter into the Lease, Lessee agrees that it shall promptly furnish Lessor, from time to time (but not more often than once per calendar year), upon Lessor's written request, with financial statements reflecting Lessee's current financial condition.  Lessor shall be entitled to make the information contained in the financial statements available to any potential partner or lenders of Lessor or purchasers of the Premises or any portion thereof Lessee represents and warrants that all financial statements, records and information furnished by Lessee to Lessor in connection with the Lease are true, correct and complete in all respects.

    23.    _Notices._ Paragraph 23 of the Lease is deleted in its entirety and replaced with the following:  Lessee agrees to send by certified or registered mail to any mortgagee or deed of trust beneficiary of the Premises whose address has been furnished to Lessee, a copy of any notice of default served by Lessee on Lessor.  If Lessor fails to cure such default within the time provided for in the Lease, such mortgagee or beneficiary shall have an additional thirty (30) days to cure such default; provided, however, that if such default cannot reasonably be cured within that thirty (30) day period, then such mortgagee or beneficiary shall have such additional time to cure the default as is reasonably necessary under the circumstances, provided such mortgagee or beneficiary commences the cure of such default within said thirty (30) day period and diligently pursues the same to completion.

    26.    _Holding Over._  Paragraph 26 of the Lease is here by amended as follows:  Acceptance by Lessor of rent after such expiration or earlier termination of the Term shall not result in any renewal of the Term.  The foregoing provisions are in addition to and do not affect

-2-



Lessor's right of re-entry or any other rights or remedies of Lessor hereunder or as otherwise provided at law or in equity, or both.  If Lessee fails to surrender the Premises upon the expiration or earlier termination of the Term, Lessee shall indemnify and hold Lessor harmless from and against any and all losses, costs, damages and liability (including actual attorneys' fees and costs, and court costs), direct or indirect, which Lessor may suffer as a result of Lessee's failure to surrender the Premises.

52.     Confidentiality.  Lessor and Lessee agree that the final terms and conditions of this Lease shall be kept confidential and shall not be disclosed to any other person or entity other than to Lessor's property manages or Lessor's or Lessee's lenders, partners, attorneys, accountants, or prospective buyers of the Premises.

53.     Tenant Improvements.  Lessor, at Lessor's sole cost and expense, shall conduct the following improvements prior to the Commencement Date:  Remove the half wall in the warehouse area, steam clean the carpet, replace broken and stained ceiling tiles, and paint the walls in the office area.  All work shall be conducted in a workmanlike and professional manner.

[END OF TEXT; SIGNATURES ON NEXT PAGE]

-3-



IN WITNESS WHEREOF, Lessor and Lessee have executed this Addendum as of the date first written above.

Lessor:

Seacliff Ponderosa, LLC, a limited liability company

By: _____
      Richard S. Hambleton Jr.
      Special Trustee for the Steadfast Family Trust
      Dated December 11, 1996

Lessee:

Interface, Inc., a Prommis Solutions Company,
a California corporation

By: _____

Its: _____

-4-

EXHIBIT "1"

COMMENCEMENT DATE MEMORANDUM

DATE:_____, 2008

RE:   Industrial/Commercial Single-Tenant Lease - Net, dated _____, 2008, by and between
      _____, as "Lessor", and _____, as "Lessee", for the Premises
      commonly known as 4241 Ponderosa Avenue, Suite G, San Diego, CA 92123.

      Agreement

      The undersigned hereby agree as follows:

      1.    The Commencement Date, as defined in and determined in accordance with the
Lease, is hereby stipulated for all purposes to be _____, 2009. The
Expiration Date is hereby stipulated for all purposes to be_____, 2011.

      2.    In accordance with the Lease, monthly Base Rent (as defined in the Lease) in the
amount of $7,015.00, subject to adjustment in accordance with the terms of the Lease,
commences to accrue on _____, 2009 and is due and payable in advance on the first
day of each and every month during the Term (as defined in the Lease).  Unless and until
notified by Lessor to the contrary, Lessee shall make its Rent checks payable to
_____ c/o Granite Peak Partners, Inc., _____.

                              "Lessor"

                         _____

                         By:_____

                           Its:_____

                         "Lessee:

                         By_____
                         Name:_____
                         Title:CEO_____

EXHIBIT "2"

ENVIRONMENTAL QUESTIONNAIRE

This Exhibit is attached to and made a part of that certain Industrial/Commercial Single-Tenant Lease – Net dated_____, 2008, by and between _____, as "Lessor", and _____, as "Lessee", for the Premises known as 4241 Ponderosa Avenue, Suite G, San Diego, CA 92123.

The purpose of this form is to obtain information regarding the use of hazardous substances on the premises. Prospective Lessees should answer the questions in light of their proposed operations on the Premises. Existing Lessees should answer the questions as they relate to on-going operations on the premises and should update any information previously submitted. If additional space is needed to answer the questions, you may attach separate sheets of paper to this form.

Your cooperation in this matter is appreciated. Any questions should be directed to, and when completed, the form should be mailed to:

> Seacliff Ponderosa
> c/o CIP Real Estate
> 19762 MacArthur Blvd., Ste. 300
> Irvine, CA  92612
> Phone: (949) 474-7030

1.   **GENERAL INFORMATION**

Name of Responding Company:     _____

Check the Applicable Status:

>        Prospective Lessee  ☐                    Existing Lessee  ☐

Mailing Address: _____

_____

Contact Person and Title: _____

Telephone Number: (   ) _____

Address of Leased Premises: _____

Length of Lease Term: _____

Described the proposed operations to take place on the property, including principal products manufactured or services to be conducted. Existing Lessees should describe any proposed changes to on-going operations.

_____

_____

_____

2.   **STORAGE OF HAZARDOUS MATERIALS**

2.1   Will any hazardous materials be used or stored on-site?

> Wastes                     Yes ☐          No ☐
> Chemical Products          Yes ☐          No ☐

2.2   Attach the list of any hazardous materials to be used or stored, the quantities that will be on-site at any time, and the location and method of storage (e.g., 55 gallon drums on concrete pad).

3.   **STORAGE TANKS & SUMPS**

3.1   Is any above or below ground storage of gasoline, diesel, or other hazardous

EXHIBIT 2"

substances in tanks or sumps proposed or currently conducted on the premises?

Yes ☐        No ☐

If yes, describe the materials to be stored, and the type, size and construction of the sump or tank. Attach copies of any permits obtained for the storage of such substances.

_____

_____

3.2   Have any of the tanks or sumps been inspected or tested for leakage?

Yes ☐        No ☐

If so, attach the results.

3.3   Have any spills or leaks occurred from such tanks or sumps?

Yes ☐        No ☐

Is so, describe.

_____

_____

3.4   Were any regulatory agencies notified of the spill or leak?

Yes ☐        No ☐

If so, attach copies of any spill reports filed, any clearance letters or other correspondence from regulatory agencies relating to the spill or leak.

3.5   Have any underground storage tanks or sumps been taken out of service or removed?

Yes ☐        No ☐

If yes, attach copies of any closure permits and clearance obtained from regulatory agencies relating to closure and removal of such tanks.

4.   SPILLS

4.1   During the past year, have any spills occurred on the premises?

Yes ☐        No ☐

If so, please describe the spill and attach the results of any testing conducted to determine the extent of such spills.

4.2   Were any agencies notified in connection with such spills?

Yes ☐        No ☐

If so, attach copies of any spill reports or other correspondence with regulatory agencies.

4.3   Were any clean-up actions undertaken in connection with the spills?

Yes ☐        No ☐

If so, briefly describe the actions taken. Attach copies of any clearance letters obtained from any regulatory agencies involved and the results of any final soil or groundwater sampling done upon completion of the clean-up work.

_____

_____

5.   WASTE MANAGEMENT

5.1   Has your company been issued an EPA Hazardous Waste Generator I.D. Number?

Yes ☐        No ☐

-2-



5.2   Has your company filed a biennial report as a hazardous waste generator?

      Yes ☐        No ☐

      If so, attach a copy of the most recent report filed.

5.3   Attach the list of the hazardous waste, if any, generated or to be generated at the premises, its hazard class and the quantity generated on a monthly basis.

5.4   Describe the method(s) of disposal for each waste. Indicate where and how often disposal will take place.

      _____

      _____

      _____

5.5   Indicate the name of the person(s) responsible for maintaining copies of hazardous waster manifests completed for off-site shipments of hazardous waste.

      _____

5.6   Is any treatment or processing of hazardous wastes currently conducted or proposed to be conducted at the premises:

      Yes ☐        No ☐

      If yes, please describe any existing or proposed treatment methods.

      _____

      _____

      _____

5.7   Attach copies of any hazardous waste permits or licenses issued to your company with respect to its operations on the premises.

**6.   WASTEWATER TREATMENT/DISCHARGE**

6.1   Do you discharge wastewater to:

      _____ storm drain?          _____ sewer?

      _____ surface water?        _____   no   industrial

discharge

6.2   Is your wastewater treated before discharge?

      Yes ☐        No ☐

      If yes, describe the type of treatment conducted.

      _____

6.3   Attach copies of any wastewater discharge permits issued to your company with respect to its operations on the premises.

**7.   AIR DISCHARGES**

7.1   Do you have any air filtration systems or stacks that discharge into the air?

      Yes ☐        No ☐

-3-



7.2 Do you operate any of the following types of equipment, or any other equipment requiring an air emissions permit?

_____ Spray booth
_____ Dip tank
_____ Drying oven
_____ Incinerator
_____ Other (Please Describe)
_____ No Equipment Requiring Air Permits

7.3 Are air emissions from your operations monitored?

Yes ☐       No ☐

If so, indicate the frequency of monitoring and a description of the monitoring results.

_____

7.4 Attach copies of any air emissions permits pertaining to your operations on the premises.

## 8. HAZARDOUS MATERIALS DISCLOSURES

8.1 Does your company handle hazardous materials in a quantity equal to or exceeding an aggregate of 500 pounds, 55 gallons, or 200 cubic feet?

Yes ☐              No ☐

8.2 Has your company prepared a hazardous materials management plan ("business plan") pursuant to County Fire Department requirements?

Yes ☐       No ☐

If so, attach a copy of the business plan.

8.3 Are any of the chemicals used in your operations regulated under Proposition 65?

Yes ☐       No ☐

If so, describe the actions taken, or proposed actions to be taken, to comply with Proposition 65 requirements.

_____

8.4 Describe the procedures followed to comply with OSHA Hazard Communication Standard requirements.

_____

## 9. ENFORCEMENT ACTIONS, COMPLAINTS

9.1 Has your company even been subject to any agency enforcement actions, administrative orders, or consent decrees?

Yes ☐       No ☐

If so, describe the actions and any continuing compliance obligations imposed as a result of these actions.

_____

9.2 Has your company even received requests for information, notice or demand letters, or any other inquiries regarding its operations?

Yes ☐       No ☐

9.3 Have there ever been, or are there now pending, any lawsuits against the company regarding any environmental or health and safety concerns?

Yes ☐       No ☐

-4-



9.4    Has an environmental audit even been conducted at your company's current
facility?

Yes ☐        No ☐

If so, discuss the results of the audit.

_____

9.5    Have there been any problems or complaints from neighbors at the company's
current facility?

Yes ☐        No ☐

If so, describe the problems or complaints.

_____

Interface, Inc., a Prommis Solutions Company, a California Corporation

By: _____
Name: _____
Title: _____

-5-



### GUARANTY OF LEASE

#### ARTICLE I.  PARTIES

The undersigned (hereinafter "Guarantor"), whose address is hereinafter set forth, as a material inducement to and in consideration of Seacliff Ponderosa, LLC, a California limited liability company (hereinafter "Lessor") entering into a written lease dated October 1, 2008 (hereinafter, the "Lease") with Interface, a Promnis Solutions Company, a California corporation (hereinafter "Lessee") for lease of those certain premises located at 4241 Ponderosa Avenue, Suite G, San Diego, CA  92123, and more particularly described in the Lease, to which this Guaranty of Lease (the "Guaranty") shall be attached and made a part, pursuant to the provisions of this Guaranty unconditionally guarantees and promises to and for the benefit of Lessor full payment and performance of each and all of the terms, covenants and conditions of the Lease by Lessee, all as more specifically set forth hereinafter. Guarantor has a financial interest in the Lessee and will benefit from the leasing of the above-referenced premises by Lessee.  Guarantor acknowledges Lessor would not execute the Lease if Guarantor did not execute and deliver to Lessor this Guaranty.

#### ARTICLE II.  GUARANTOR'S DUTIES

##### Section 2.1.  Guarantee of Lessee's Performance

Guarantor hereby unconditionally guarantees to Lessor the full and complete performance of each and all of the terms, covenants and conditions of the Lease as required to be performed by Lessee, including, but not limited to, the payment of all rental, property taxes, operating expenses, and any and all other charges or sums, or any portion thereof, to accrue or become due from Lessee to Lessor pursuant to the terms of the Lease.

##### Section 2.2.  Lessee's Failure to Perform

2.2.1.  Payment of Rental and Other Sums.  In the event that Lessee shall fail to pay any rental, property taxes, operating expenses, or any other sums or charges, or any portion thereof, accrued or due pursuant to the terms of said Lease, including without limitation any obligations incurred by Lessee as a result of a hold-over beyond the term of the Lease, then upon written notice to Guarantor by Lessor as herein provided, Guarantor shall within five (5) business days pay to Lessor or Lessor's designated agent any and all such amounts as may be due and owing from Lessee to Lessor by reason of Lessee's failure to perform.

2.2.2.  Other Provisions.  In the event that Lessee shall fail to perform any covenants, terms or conditions of the Lease as required to be performed, other than as provided for in Section 2.2.1. above, then upon written notice to Guarantor by Lessor, as provided herein, Guarantor shall commence and complete performance of such conditions, covenants and terms within five (5) business days after the date of Lessor's notice to Guarantor of such failure by Lessee to so perform, and in the event such performance by Guarantor cannot be completed within said five (5) business days, Guarantor shall commence performance within said time and shall diligently pursue completion thereof within a reasonable time duly set forth hereinafter.

2.2.3.  Interest and Additional Damages.  In addition to the payment of rental and other sums, and the performance of any and all other provisions, conditions and terms of the Lease which may be required of Guarantor by reason of Lessee's failure to perform, Guarantor agrees to pay to Lessor any and all reasonable and necessary incidental damages and expenses incurred by Lessor as a direct and proximate result of Lessee's failure to perform. Guarantor further agrees to pay to Lessor interest on any and all sums due and owing Lessor, by reason of Lessee's failure to pay same, at the highest rate as allowed by law at the time of payment thereof.

#### ARTICLE III.  LESSOR'S RIGHTS

##### Section 3.1.  Enforcement

Notwithstanding the provisions of Section 2.2.1. above, Lessor reserves the right, in the event of any failure of Lessee to pay rental, property taxes, operating expenses and other sums which may become due and owing pursuant to the terms of the Lease, to proceed against Lessee or Guarantor, or both, and to enforce against Guarantor or Lessee, or both, any and all rights that Lessor may have to said rental, property taxes, operating expenses and other sums accrued pursuant to the terms of the Lease, without giving prior notice to Lessee or Guarantor, and without making demands therefor on either of them.  Guarantor understands and agrees that its liability under this Guaranty shall be primary (and joint and several with Lessee) and that, in any right of action which may accrue to Lessor under the Lease or this Guaranty, Lessor at its option may proceed against Guarantor without having taken any action or obtained any judgment against Lessee.

##### Section 3.2.  Guarantors Waivers

In addition to any other waiver herein and except as otherwise specifically provided in this Guaranty, Guarantor hereby waives:

(a) any and all notices, presentments, notice of nonpayment or nonperformance;

(b) all defenses by reason of any disability of Lessee;

1



(c) any and all rights it may have now or in the future, whether pursuant to Section 2845 of the California Civil Code or otherwise, to require or demand that Lessor pursue any right or remedy Lessor may have against Lessee or any other third party;

(d) until such time as all obligations of Lessee under the Lease have been satisfied in full, any and all rights it may have for subrogation against, or reimbursement from, Lessee with respect to any sums paid hereunder; and

(e) any and all right to the benefit of, or to participate in, any security held by Lessor now or in the future, or to require that such security be applied by Lessor either (i) prior to any action against Guarantor hereunder or (ii) as a credit or offset against sums owing hereunder.

## ARTICLE IV.  ALTERATION, MODIFICATION, OR ASSIGNMENT

### Section 4.1.  Effect of Extension, Modification, or Alteration of Lease

Guarantor understands and agrees that notwithstanding the provisions of Section 2819 of the California Civil Code, the obligations of Guarantor under this Guaranty shall in no way be affected by any extension, modification or alteration of the Lease, including, but not limited to, Lessee entering into any sublease thereunder, or Lessee's obligations under the Lease and each of its provisions, and any such extension, modification or alteration of the Lease, including Lessee entering into any sublease thereunder, shall in no way release or discharge Guarantor from any obligations accruing under this Guaranty.  The term "Lease" shall include all amendments, modifications, alterations and extensions of the Lease.

### Section 4.2.  Assignment

Guarantor understands and agrees that any assignment of the Lease, or any rights or obligations accruing thereunder, shall in no way affect Guarantor's obligations under this Guaranty.

### Section 4.3.  Delay in Enforcement/Settlements

Guarantor understands and agrees that any failure or delay of Lessor to enforce any of its rights under the Lease or this Guaranty shall in no way affect Guarantor's obligations under this Guaranty, nor shall any settlement or release with Lessee or any third party release or discharge Guarantor from its obligations hereunder.

## ARTICLE V.  LESSEE'S INSOLVENCY

### Section 5.1.  Liability upon Lessee's Insolvency

Guarantor understands and agrees that in the event Lessee shall become insolvent or be adjudicated bankrupt, whether by voluntary or involuntary petition, or shall a petition for organization, arrangement, or similar relief be filed against it, or if a receiver of any part of its property or assets is appointed by any court, Guarantor will remain obligated to pay to Lessor the amount of all unpaid rent, property taxes, operating expenses, and any other sums accrued and thereafter accruing under the Lease.

### Section 5.2.  Effect of Operation of Law

Any operation of any present or future debtor's relief act or similar act or law, or decision of any court, shall in no way abrogate or otherwise limit the obligation of Guarantor to perform any of the terms, covenants or conditions of this Guaranty.

## ARTICLE VI.  MISCELLANEOUS

### Section 6.1.  Notices

Any and all notices required under this Guaranty shall be made in writing, and shall be personally delivered, sent by reputable courier or overnight delivery service, or mailed, first-class mail, postage prepaid, to the party who is designated to receive such notice at the address set forth after their respective signatures on this Guaranty, or at such other place as may be designated by said party upon written notice from time to time hereafter.

### Section 6.2.  Extent of Obligations

Notwithstanding anything to the contrary in this Guaranty, it is understood and agreed that this Guaranty shall extend to any and all obligations of Lessee under the Lease.

### Section 6.3.  Assignability

This agreement may be assigned in whole or in part by Lessor at any time to any successor to Lessor's interest in the leased premises and/or to any lender of Lessor.

### Section 6.4.  Successors and Assigns

The terms and provisions of this Guaranty shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

2



### Section 6.5. Modification of Guaranty

This Guaranty constitutes the full and complete agreement between the parties hereto, and it is understood and agreed that the provisions hereof may only be modified by a writing executed by both parties hereto.

### Section 6.6. Number and Gender

As used herein the singular shall include the plural, and as used herein the masculine shall include the feminine and neuter genders.

### Section 6.7. Captions/Headings

Any captions or headings used in this Guaranty are for reference purposes only and are in no way to be construed as part of this Guaranty.

### Section 6.8. Invalidity

If any term, provision, covenant or condition of this Guaranty is held to be void, invalid, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

### Section 6.9. Jurisdiction

The validity of this agreement and of any of its terms or provisions, as well as the rights and duties of the parties hereunder, shall be interpreted and construed pursuant to and in accordance with the laws of the State of California. Guarantor consents to the jurisdiction of any competent state or federal court in California where Lessor may elect to initiate an action to enforce its rights hereunder.

### Section 6.10. Joint and Several

Should more than one party execute this instrument as Guarantor, then the obligations of each such party shall be joint and several.

### Section 6.11. Attorney's Fees

In the event it becomes necessary to enforce any of the terms and provisions of this Guaranty, whether or not suit is instituted, the prevailing party shall be entitled to its reasonable costs and expenses incurred with respect thereto, including, but not limited to, reasonable attorney's fees, and such other costs and expenses as may be allowed by law.

### Section 6.12. Guaranty of Payment and Performance

It is understood and agreed that this Guaranty is unconditional and continuing, and a guarantee of payment and performance and not of collection.

### Section 6.13. Waiver of Jury Trial

GUARANTOR ACKNOWLEDGES THAT IT IS AWARE OF AND HAS HAD THE ADVICE OF COUNSEL OF ITS CHOICE WITH RESPECT TO ITS RIGHT TO TRIAL BY JURY, AND TO THE MAXIMUM EXTENT PERMITTED BY LAW, DOES HEREBY EXPRESSLY AND KNOWINGLY WAIVE AND RELEASE ALL SUCH RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY OR AGINST GUARANTOR (AND/OR AGAINST GUARANTOR'S MANAGERS, MEMBERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SUBSIDIARY OR AFFILIATED ENTITIES) ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTY. IN THE EVENT THIS PROVISION IS FOR ANY REASON UNENFORCEABLE, ALL CLAIMS, CONTROVERSIES AND DISPUTES ARISING UNDER OR IN CONNECTION WITH THIS GUARANTY SHALL BE DECIDED BY JUDICIAL REFERENCE UNDER SECTION 638 THROUGH 645.1 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE, OR ANY SUCCESSOR STATUTES.

[END OF TEXT; SIGNATURES APPEAR ON NEXT PAGE]

3



**ARTICLE VII. EXECUTION**

IN WITNESS WHEREOF, the undersigned have executed this Guaranty of Lease and made it effective this ___ day of _____ 2008.


Guarantor:

Prommis Solutions Holding Corp.

By: _____

Its: _____


TIN# _____

4



SITE PLAN OF PREMISES





P.037

SITE PLAN OF PROJECT



TOTAL P.037



# STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET
## AIR COMMERCIAL REAL ESTATE ASSOCIATION

1.   **Basic Provisions ("Basic Provisions")**

1.1   **Parties:** This Lease ("Lease"), dated for reference purposes only October 3, 2008
is made by and between Seacliff Ponderosa LLC, a California limited liability company

and Interface, Inc., a Promis Solutions Company, a California corporation   ("Lessor")

("Lessee") (collectively the "Parties", or individually a "Party")

1.2(a)   **Premises:** That certain portion of the Project (as defined below), including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known by the street address of 4241 Ponderosa Avenue, Suite G
located in the City of San Diego                                        , County of San Diego                , State of
California                          with zip code 92121         , as outlined on Exhibit _____ attached hereto ("Premises")
and generally described as (describe briefly the nature of the Premises)   consists of approximately 6,100 rentable
square feet of space

In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the any utility raceways of the building containing the Premises ("Building") and to the common Areas (as defined in Paragraph 2.7 below), but shall not have any rights to the roof or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." (See also Paragraph 2)

1.2(b)   **Parking:** Twenty (20)                                        unreserved vehicle parking spaces. (See also Paragraph 2.6)

1.3   **Term:** Three (3)                                 years and zero (0)                            months ("Original Term")
commencing January 1, 2009                          ("Commencement Date") and ending December 31, 2011
("Expiration Date") (See also Paragraph 3)

1.4   **Early Possession:** November 1, 2008                                        ("Early Possession Date").
(See also Paragraphs 3.2 and 3.3)

1.5   **Base Rent:** $   7,015.00          per month ("Base Rent"), payable on the first
day of each month commencing January 1, 2009                                        (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph

1.6   **Lessee's Share of Common Area Operating Expenses:** Three and ninety-two hundredths   percent
(3.92 %) ("Lessee's Share") Lessee's Share has been calculated by dividing the approximate square footage of the Premises by the approximate square footage of the Project. In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

1.7   **Base Rent and Other Monies Paid Upon Execution:**

(a)   Base Rent: $7,015.00         for the period January 1-31, 2009
(b)   Common Area Operating Expenses: $1,992.00                for the period January 1-31, 2009
(c)   Security Deposit: $7,442.21           ("Security Deposit") (See also Paragraph 5)
(d)   Other: $0.00             for

(e)   Total Due Upon Execution of this Lease: $16,499.21

1.8   **Agreed Use:** General office and warehouse for printing/sorting/mailing company

1.9   **Insuring Party:** Lessor is the "Insuring Party". (See also Paragraph 8)   (See also Paragraph 6)

1.10   **Real Estate Brokers:** (See also Paragraph 15)

(a)   **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☑ Cushman & Wakefield of San Diego, Inc.                          represents Lessor exclusively ("Lessor's Broker");
☑ Newburger-Andes & Co.                                      represents Lessee exclusively ("Lessee's Broker"); or
☐                                              represents both Lessor and Lessee ("Dual Agency")

(b)   **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent for the brokerage services rendered by the Brokers)

1.11   **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by Promis Solutions
Holding Corp.                                                          ("Guarantor") (See also Paragraph 37)

1.12   **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☑ an Addendum consisting of Paragraphs 50                        through 53
☑ a site plan depicting the Premises;
☑ a site plan depicting the Project;
☐ a current set of the Rules and Regulations for the Project;
☐ a current set of the Rules and Regulations adopted by the owners' association;

PAGE 1 OF 17

INITIALS                                                                   INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                             FORM MTN-7-8/07E



**PROPERTY SERVICES**

19762 MacArthur Blvd., Suite 300
Irvine, CA 92612-2498

tel    949.474.7030
fax   949.474.2101
www.ciprealestate.com

March 24, 2009

<u>**Via First Class Mail**</u>

Chris Padilla
Director
**Interface Inc, a Prommis Solutions Company**
4241 Ponderosa Ave, Suite G
San Diego, CA 92123

RE:  **2009 OPERATING EXPENSE ESTIMATE**
      **4241 Ponderosa Avenue, Suite G - San Diego, CA 92123**

Dear Chris:

Please find enclosed the Operating Expense Estimate for 2009.  For your review, I have attached a breakdown of the estimated operating costs to be spent in 2009. Based upon the estimate, Interface Inc's new monthly CAM fee will be $2,222.

This new estimated expense will appear on the April rent statement.

Should you have any questions or concerns please, do not hesitate to contact me at 949.474.7030 extension 314.

Sincerely,

Devon Stanke
Property Manager

Enclosures

**2009 Operating Expense Estimate**
**Ponderosa Technology Park**
**Prepared by: CIP Real Estate Property Services**
**Date:      March 25, 2009**

### 2009 Operating Expense Estimate

| | |
|---|---|
| **Tenant:** | Interface, Inc. |
| **Address:** | 4241 Ponderosa Avenue |
| **Suite Number:** | G |
| **Premises Square Footage:** | 6,100 |
| **Tenant's Prorata Share:** | 3.92% |
| | |
| 2009 Estimated Expense: | $    680,039 |
| | |
| Tenant's Annual Share: | $     26,668 |
| **Tenant's 2009 Monthly Share:** | $      2,222 |

( Common area mainenence )

**Ponderosa Technology Park**
**2009 Estimated Expenses**

| | | |
|---|---|---:|
| Management Fees | $ | 87,943 |
| Utilities | $ | 56,522 |
| Trash Disposal | $ | 39,000 |
| Maintenance & Repair | $ | 102,430 |
| *Maintenance & Repair - amortization | $ | 48,821 |
| Property Taxes | $ | 321,180 |
| Insurance | $ | 24,143 |
| | | |
| Total Expenses | | **$680,039** |

*Maintenance & Repair amortization includes the following expenses:

2001 Roof Replacement (20-year amortization) in the amount of $15,860.
Year 9 of 20 year amortization schedule: $15, 860 has been collected.
Total amount amortized is $317,200.

*2007 Parking Lot Petromat (3 year amortization) in the amount of $32,961
Year 3 of the 3 year amortization Schedule: $32,961 has been collected
Total amount amortized is $98,882

Prepared By: CIP Real Estate Property Services
3/25/2009

# FIRST AMENDMENT TO STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE-NET

### By and Between

### SEACLIFF PONDEROSA LLC,
a California limited liability company


### and


### INTERFACE, INC.,
a California corporation

---

This First Amendment to Standard Industrial/Commercial Multi-Tenant Lease-Net ("First Amendment") is made and entered into in San Diego County, California as of September 7, 2011, by and between Seacliff Ponderosa LLC, a California limited liability company ("Lessor") and Interface, Inc., a California corporation ("Lessee") with reference to the following facts:

### RECITALS

A.   Lessor and Lessee are parties to that certain Standard Industrial/Commercial Multi-Tenant Lease - Net dated October 1, 2008 ("Lease") for certain premises comprising approximately six thousand one hundred (6,100) rentable square feet within Suite G ("Premises") which comprises a portion of the Ponderosa Technology Park building located at 4241 Ponderosa Avenue, San Diego, California, all as more particularly described in the Lease.

B.   Lessor and Lessee desire to hereby amend the Lease on the terms and conditions provided below.

C.   Capitalized Terms not otherwise defined herein shall have the meanings given them in the Lease.

### AGREEMENTS

**NOW, THEREFORE,** for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee agree as follows:

Lessor's Initials: _GNS_

1

Tenant's Initials: _a_

1. **Incorporation of Recitals:**  All of the recitals set forth above are hereby made an integral part of this First Amendment.

2. **Term:**  Notwithstanding any provision to the contrary contained in the Lease, the term of the Lease is hereby extended for a period of thirty-nine (39) months commencing on January 1, 2012, and expiring on March 31, 2015 (the "2012 Extended Term").

3. **Base Rent:**  Base Rent payable during the 2012 Extended Term shall be as follows:

| MONTHS | RATE PER S/F PER MONTH | TOTAL RENT PER MONTH |
|---|---|---|
| 1/01/12 – 3/31/12 | $0.0000 | $0.00 |
| 4/01/12 – 3/31/13 | $1.0500 | $6,405.00 |
| 4/01/13 – 3/31/14 | $1.0815 | $6,597.15 |
| 4/01/14 – 3/31/15 | $1.1139 | $6,795.06 |

4. **Premises "As-Is":**  Lessor shall have no obligation to prepare the Premises for Lessee's continued occupancy, it being acknowledged and agreed that Lessee is currently in possession of the Premises as Lessee under the Lease.

5. **Brokerage:**  Lessor and Lessee acknowledge that CIP Real Estate Property Services, a licensed real estate broker (the "Lessor's Broker") represented Lessor in this transaction and Jack Kruger of Cassidy Turley BRE Commercial, a licensed real estate broker ("Lessee's Broker") represented Lessee in this transaction.  Lessor agrees to pay Lessee's Broker a commission in an amount equal to four percent (4%) of the Base Rent payable by Lessee during the 2012 Extended Term.  Such commission shall be paid upon the commencement of the 2012 Extended Term.  Lessor and Lessee each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder, other than the named Brokers, in connection with this First Amendment, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith.  With respect to this First Amendment only, Lessor and Lessee do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any other broker, finder or other similar party by reason of any dealings or actions of the indemnifying party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

6. **No Defaults:**  There are no defaults of Lessor under the Lease nor any existing conditions, which upon giving notice or lapse of time or both would constitute a default under the Lease and there are no offsets or credits against the payment of rent due under the Lease.

7. **Authority:**  Each party hereto and the person signing below warrant that the person signing

Lessor's Initials: _GHS_                                          Tenant's Initials: _CL_  

2

below on such party's behalf is authorized to do so and to bond such party to the terms of this First Amendment.

8. **Effectiveness of First Amendment, Affirmation of Lease**:  Except for any financial incentives or construction work previously provided Lessee and except as specifically amended and modified by this First Amendment, the Lease is hereby affirmed and remains in full force and effect. In the event of any conflict between the terms of this First Amendment and the Lease, the terms and conditions of this First Amendment shall prevail.

**AGREED AND ACCEPTED:**

**LESSOR:**

SEACLIFF PONDEROSA LLC
a California limited liability company

By: _Gregory A Smith_
Its: _Manager_
Date: _10/19/11_

**LESSEE:**

INTERFACE, INC.
a California corporation

By: _____
Its: _Charlie Piper, COO_
Date: _9/21/11_

Lessor's Initials: _G-HS_

3

Tenant's Initials: _OA_

**EXHIBIT "B-3"**

**Personal Property Lease**

[See Attached]

# ⣿ PitneyBowes

*Engineering the flow of communication™*

Agreement Number:

Agreement Number:

| 1498023-001 |

## Your Business Information

IPrommis Solutions Holding Corp.

| | | |
|---|---|---|
| Full legal name of lessee | DBA name of lessee | Tax ID # (FEIN/TIN) |
| 400 Northridge Road | Atlanta | GA. 30350 |
| Billing address | City | State ZIP+4 |
| Kimberly Mallon | 678-277-5172 | |
| Billing contact name | Billing contact phone # | Billing CAN # |
| 4241 Ponderosa Ave | San Diego | CA 92123 |
| Installation address *(if different from billing address)* | City | State ZIP+4 |
| Christopher Padilla | 619-285-0700 | |
| Installation contact name | Installation contact phone # | Installation CAN # |
| | | |
| Please note any special billing requirements here | Invoice attention of | Customer PO # |

## Your Business Needs

| Quantity & PCN# | Business Solution Description |
|---|---|
| 1 | Flexible Productivity System - 9K |
| | Please see attached Schedule A |
| | For System Configuration |
| | |
| | |
| | |
| | |

Check items to be included in customer's payment:

☒ Software Maintenance Agreement (additional terms apply)

☒ Hardware Maintenance Agreement (onsite or oncall, additional terms apply)

☒ IntelliLink® Subscription/Meter Rental/Value Based Services
*For solutions that include DM Infinity™ technology (additional terms apply)*

## Your Payment Plan

| Number of months | Monthly Amount |
|---|---|
| 60 | $7,111.67 |
| | |
| | |
| | |

☐ Required advance check of $          received

☐ Tax exempt certificate attached

*Does not include any applicable Sales Taxes & Payment plans begin after any applicable Prorated Usage Period.

## Your Acknowledgment

This document consists of an Equipment Lease ("Lease") with Pitney Bowes Global Financial Services LLC (PBGFS), may include a hardware and/or software maintenance agreement with Pitney Bowes Inc., a US Postal Service Acknowledgment of Deposit and an Equipment Guide. Your signature constitutes an offer to enter into the Lease and, if applicable, the other agreements and acknowledges that you have read and agree to all applicable terms and conditions and are authorized to sign the agreement on behalf of the Lessee. The Lease portion of this document will become binding on PBGFS only after an authorized employee accepts your offer by signing below

| | | |
|---|---|---|
| *[signature]* | 4/27/10 | |
| Signature | Date | |
| George W. Dunaway | CFO | george.dunaway@prommis.com |
| Print name | Title | *[signature]* Salvatore Poilletta |
| | | |
| Account rep | District office | PBGFS acceptance |

Form 15356 Rev (8/08) DMT

Equipment Vendor: Pitney Bowes Inc.
For Sales and Service call 1-800-322-8000

{C0071254.1 }



**PBCC**
9/21/2006

Pitney Bowes Credit Corp.

# NEW BUSINESS OPERATIONS CENTER
### SCANNING TRANSMITTAL FORM

DATE: _12/20/06_

TO: _____CUSTOMER CONTRACTS_____

RE: _____SCANNING REQUEST_____

- Scan the attached documentation under
  **MAJOR ACCOUNT #**

  _____

- Scan the attached documentation under
  **LEASE/ SCHEDULE #**

  _____

- Ts & Cs – Terms and Conditions

  Form # _leasetrm_____

  Rev. Date _____

  Pathfinder Release Date _August '06_____

Submitted by: BMCFADDEN _____     Last printed on 9/21/2006

NBOC Scanning Transmittal Form.doc



**Pitney Bowes**

*Engineering the flow of communication™*



EQUIPMENT GUIDE



## EXHIBIT C

### TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "<u>Agreement</u>"), is being executed and delivered by and between Cal-Western Reconveyance Corporation, a California corporation ("Cal"), Reliable Reconveyance Corporation, a California corporation ("Reliable"), and Interface Inc. a California corporation ("Interface", together with Cal and Reliable, the "APA Sellers"), Prommis Solutions, LLC, a Delaware limited liability company ("Prommis", and collectively with APA Sellers, the "Sellers") and Cypress Innovations, Inc., a Nevada corporation or its affiliated assignee ("Buyer"), as of this [●] day of [___], 2013, pursuant to that certain Asset Purchase Agreement, dated as of May [___] 2013, by and among Sellers and Buyer (the "<u>Purchase Agreement</u>").

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Sellers and Buyer desire to enter into this Agreement to provide for certain services that will be provided to Buyer following the closing of the transactions contemplated by the Purchase Agreement, which closing will occur on the date hereof; and

NOW, THEREFORE, in consideration of the promises and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Capitalized Terms</u>.  All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

2.      <u>Services</u>.

2.1     The services to be rendered by Sellers under this Agreement, and the duration of such services, are set forth on <u>Schedule A</u> attached hereto and made a part hereof, and are hereinafter referred to as the "<u>Services</u>."

2.2     All Services provided by Sellers under this Agreement shall be on a fee-free basis.  Buyer shall advance to Sellers on a weekly basis an amount equal to Sellers' estimated (as determined by Sellers in good faith) out-of-pocket costs and expenses to be incurred by Sellers in connection with providing the Services for the immediately following week, including, without limitation, that portion of the wages or salary (as applicable) of each employee of any Seller performing any Services hereunder allocable to the time such employee spends performing the Services.  Sellers will provide such estimates from time to time in advance of Buyer's obligation to remit payment to Sellers.  As promptly as possible following the date hereof, but no later than five (5) business days thereafter, Sellers shall provide Buyer with a proposed budget for Sellers' out-of-pocket costs and expenses to be incurred in connection with the Services.

2.3     Sellers understand that the duration of some of the Services may need to be extended or that additional services that are not reflected in <u>Schedule A</u> may become necessary during the transition period.  Sellers agree to cooperate in good faith to extend such duration or provide such services upon reasonable request to the extent it is commercially reasonable for Sellers to extend the duration or provide such services.

2.4    Notwithstanding anything herein to the contrary, in the event that Buyer is in material default under the Purchase Agreement, including, without limitation, with respect to the failure to pay any portion of the Purchase Price when due thereunder, Sellers shall no longer be required to perform any Services hereunder.

3.    Term and Termination.

3.1    The term of this Agreement shall commence on the date hereof and shall terminate as of the date that the provision of all Services has been discontinued in accordance with the terms and conditions of this Agreement, including Schedule A hereto.

3.2    If Buyer desires to discontinue (in whole or in part) one or more of the Services during the term of this Agreement, Buyer shall give Sellers at least ten (10) Business Days' prior written notice requesting discontinuance of such Service (or part thereof) and specifying the date of discontinuance.

3.3    In the event that the Sellers discontinue performing Services pursuant to Section 2(d) above, except for Section 4, which shall survive in accordance with its terms, this Agreement shall immediately terminate, Sellers shall have no further obligations hereunder, and Buyer shall immediately pay Sellers for all amounts accrued and unpaid hereunder.

4.    Separation of Services.   Each party hereby agrees that notwithstanding its obligation to provide or cause to be provided each applicable Service as described herein, the other party may desire to contract directly with a third party to provide such Service, and may terminate the provision of such Services once such third party is contracted.  Notwithstanding this, each party agrees to use its commercially reasonable efforts to end its need for Services as soon as reasonably practicable.

5.    Relationship of the Parties.   The relationship of Sellers, on the one hand, and Buyer, on the other hand, is that of a vendor and Buyer.  This Agreement does not in any way create the relationship of principal and agent between Sellers and Buyer.  For such time as any employees of Sellers are providing Services under this Agreement, (a) such employees shall not be deemed to be employees of Buyer or its Affiliates for any purpose, and (b) Sellers shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable Taxes relating to such employment.

6.    No Waiver.  The failure of either party at any time to require performance by the other party of any obligation provided for in this Agreement shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by a party of a breach of any provision of this Agreement by the other party constitute a waiver of any succeeding breach of the same or any other such provision nor constitute a waiver of the obligation itself.

7.    Assignment.  This Agreement may not be assigned by either party without the prior written consent of the other party.  Any purported assignment without such consent shall be void and of no effect.  Notwithstanding the foregoing, Buyer may assign, in part or in whole, its rights under this Agreement to any of its affiliates or to any entity in which Buyer or any of its

affiliates owns an equity interest, and Sellers may delegate the performance of any Services to be provided under this Agreement to one or more of their affiliates.

      8.    Notices.  All notices, requests, claims, demands, disclosures and other communications required or permitted by this Agreement shall be in writing and shall be deemed to have been given at the earlier of the date (a) when delivered personally, by messenger or by overnight delivery service by a recognized commercial carrier to an officer of the other party; (b) five days after being mailed by registered or certified United States mail, postage prepaid, return receipt requested, or (c) when received via facsimile or electronic mail (confirmed by telephone in each case), in all cases addressed to the person for whom it is intended at his address set forth below or to such other address as a party shall have designated by notice in writing to the other party in the manner provided by this Section 8:

If to Sellers:      Prommis
                         400 Northridge Road
                         Atlanta, Georgia 30350
                         Attention:     Charles Piper
                                        Hillary Shaw

With a copy to (which shall not constitute notice):

                         Womble Carlyle Sandridge & Rice, LLP
                         222 Delaware Avenue, Suite 1501
                         Wilmington, DE 19801
                         Attention: Steve Kortanek, Esq.

If to Buyer:      Robert H. Hosch, Jr.
                         13800 Montfort Drive STE 300
                         Dallas TX 75240

With a copy to (which shall not constitute notice):

                         Law Offices of Mary J. Drury & Associates
                         5130 South Fort Apache Road #215-290
                         Las Vegas, Nevada 89148
                         Attention:     Mary J. Drury, Esq.

      9.    Severability.  If any part of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect, and shall in no way be effected, impaired or invalidated.

      10.    Entire Agreement; Amendment.  This constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions of the parties, whether oral or written. There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof, except as specifically set forth herein.  No amendment,

supplement, modification or termination of this Agreement shall be binding unless executed in writing by the party to be bound thereby.

      11.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of California (regardless of the Laws that might otherwise govern under applicable California principles of conflicts of Law) as to all matters, including matters of validity, construction, effect, performance and remedies.

      12.    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Agreement.  The execution of this Agreement by any of the parties may be evidenced by way of a facsimile transmission of such party's signature, or a photocopy of such facsimile transmission, and such facsimile signature shall be deemed to constitute the original signature of such party hereto.

<div align="center">[Signature pages follow.]</div>

IN WITNESS WHEREOF, Buyer and Sellers have caused this Agreement to be duly executed by their respective officers, each of whom is duly authorized, all as of the day and year first above written.

Sellers:

Cal-Western Reconveyance Corporation,
a California corporation

By: _____
Printed Name: _____
Title: _____

Reliable Reconveyance Corporation,
a California corporation

By: _____
Printed Name: _____
Title: _____

Interface Inc.,
a California corporation

By: _____
Printed Name: _____
Title: _____

Prommis Solutions, LLC,
a Delaware limited liability company

By: _____
Printed Name: _____
Title: _____

Buyer:

Cypress Innovations, Inc.,
a Nevada corporation
By: _____
Printed Name: _____
Title: _____

SCHEDULE A

<u>Scope of Services</u>

| <u>Service</u> | <u>Duration</u> | <u>Description</u> |
|---|---|---|
| IDA/Dax | Date hereof through August 2, 2013 | - Sellers shall set up and maintain an instance of DAX, IDA and related billing and client information/database systems sufficient to provide Buyer twenty-four hour/seven day a week access<br><br>- Buyer understands and agrees that following August 2, 2013, such instance shall remain either a COLO at Buyer's expense or on the premises subject to the Prommis Lease<br><br>- Sellers shall provide Buyer training on DAX, IDA and related billing and client information/database systems |
| TESS Platform | Date hereof through August 2, 2013 | - Sellers shall maintain and assist with separating out Cal's servers in the Sellers' collocation facility<br><br>- Buyer understands and agrees that it will need to relocate these servers prior to August 2, 2013 |

## EXHIBIT D

### BILL OF SALE

This BILL OF SALE (this "Bill of Sale") is being executed and delivered by Cal-Western Reconveyance Corporation, a California corporation ("Cal"), Reliable Reconveyance Corporation, a California corporation ("Reliable"), and Interface Inc. a California corporation ("Interface" and, collectively with Cal and Reliable, each, a "Transferor", and together, "Transferors") and Cypress Innovations, Inc., a Nevada corporation ("Transferee"), as of this [●] day of [___], 2013, pursuant to that certain Asset Purchase Agreement, dated as of [_____], by and among Transferors, Transferee and Prommis Solutions, LLC, a Delaware limited liability company (the "Purchase Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Transferors do hereby grant, bargain, transfer, sell, assign, convey and deliver to Transferee, all of Transferors' right, title and interest in and to the Assets transferred pursuant to the Purchase Agreement as held by Transferors, free and clear of all Liens, it being understood that Transferee shall not take title to any governmental licenses, cash or other assets and properties of the Sellers other than the Assets.

From time to time after the date hereof, at Transferee's request and without further consideration, Transferors shall execute and deliver or cause to be executed and delivered such further instruments of transfer and assignment and shall take such other action as Transferee may reasonably request in order to consummate the transactions contemplated by this Bill of Sale.

This Bill of Sale is being delivered pursuant to the Purchase Agreement and shall be construed consistently therewith. To the extent of any inconsistency between this Bill of Sale and the Purchase Agreement, the Purchase Agreement shall control and prevail.

This Bill of Sale shall be construed and interpreted according to the laws of the State of California, without regard to the conflicts of law rules thereof. This Bill of Sale may be executed in one or more counterparts.

[Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be duly executed as of the date first written above.

Transferors:

Cal-Western Reconveyance Corporation,
a California corporation


By: _____
Printed Name: _____
Title: _____

Reliable Reconveyance Corporation,
a California corporation


By: _____
Printed Name: _____
Title: _____

Interface Inc.
a California corporation


By: _____
Printed Name: _____
Title: _____

Transferee:

Cypress Innovations, Inc.,
a Nevada corporation


By: _____
Printed Name: _____
Title: _____


[Signature Page to Bill of Sale]

## **EXHIBIT E**

### ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment and Assumption Agreement") is being executed and delivered by Cal-Western Reconveyance Corporation, a California corporation ("Cal"), Reliable Reconveyance Corporation, a California corporation ("Reliable"), and Interface Inc. a California corporation ("Interface" and, collectively with Cal and Reliable, each, a "Transferor", and together, "Transferors"), Prommis Solutions, LLC, a Delaware limited liability company ("Solutions"), and Cypress Innovations, Inc., a Nevada corporation ("Transferee"), as of this [●] day of [_____], 2013, pursuant to that certain Asset Purchase Agreement, dated as of [_____], by and among certain Transferors, Prommis and Transferee (the "Purchase Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Transferors hereby assigns to Transferee, and the Transferee hereby irrevocably assumes, all rights, title and obligations of Transferors related to the Assumed Obligations, including all rights, title and obligations of Interface to the Interface Lease, it being understood that Transferee shall not assume any other obligations of any of the Transferors.

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Solutions hereby assigns to Transferee, and the Transferee hereby irrevocably accepts and assumes all rights, title and obligations of Solutions under the Solutions Lease, it being understood that Transferee shall not assume any other obligations of Solutions.

From time to time after the date hereof, at Transferee's request and without further consideration, Transferors shall execute and deliver or cause to be executed and delivered such further instruments of transfer and assignment and shall take such other action as Transferee may reasonably request in order to consummate the transactions contemplated by this Assignment and Assumption Agreement.

This Assignment and Assumption Agreement is being delivered pursuant to the Purchase Agreement and shall be construed consistently therewith. To the extent of any inconsistency between this Assignment and Assumption Agreement and the Purchase Agreement, the Purchase Agreement shall control and prevail.

This Assignment and Assumption Agreement shall be construed and interpreted according to the laws of the State of California, without regard to the conflicts of law rules thereof. This Assignment and Assumption Agreement may be executed in one or more counterparts.

[Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be duly executed as of the date first written above.

Transferors:                                Prommis Solutions, LLC,
                                            a Delaware limited liability company


                                            By:        _____
                                            Printed Name:  _____
                                            Title:      _____


                                            Cal-Western Reconveyance Corporation,
                                            a California corporation


                                            By:        _____
                                            Printed Name:  _____
                                            Title:      _____


                                            Reliable Reconveyance Corporation,
                                            a California corporation


                                            By:        _____
                                            Printed Name:  _____
                                            Title:      _____


                                            Interface Inc.
                                            a California corporation


                                            By:        _____
                                            Printed Name:  _____
                                            Title:      _____


Transferee:                                 Cypress Innovations, Inc.,
                                            a Nevada corporation


                                            By:        _____
                                            Printed Name:  _____
                                            Title:      _____


[ASSIGNMENT AND ASSUMPTION AGREEMENT SIGNATURE PAGE]

# Exhibit 2

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PROMMIS HOLDINGS, LLC, et al.,[1] | ) | Case No. 13-10551(BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## BIDDING PROCEDURES FOR ALTERNATIVE PROPOSALS FOR SALE OF CERTAIN ASSETS OF INTERFACE, INC., CAL-WESTERN RECONVEYANCE CORPORATION, RELIABLE RECONVEYANCE CORPORATION AND PROMMIS SOLUTIONS, LLC TO CYPRESS INNOVATIONS, INC.

These procedures (the "Bidding Procedures") shall govern the solicitation and consideration of alternative asset purchase proposals ("Alternative Proposals")[2] on higher and better terms than those reflected in the Asset Purchase Agreement for the Sale of Certain Assets of debtor Interface, Inc. and non-debtors Cal-Western Reconveyance Corporation and Reliable Reconveyance Corporation (collectively, the "Sellers") to Cypress Innovations, Inc. (the "Buyer" or "Cypress").

## The Proposed Sale and Asset Purchase Agreement

On May 16, 2013, the Debtors filed their Motion to Approve Asset Purchase Agreement (the "APA") and Sale of Certain Assets to Cypress, along with the APA.

## Bidding Procedures

Any counter-proposal, solicitation or offer (each, a "Bid")[3] by a potential bidder (each, a "Bidder") must be submitted in writing, binding and determined by the Debtors, after consultation

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Prommis Holdings, LLC (6940); Prommis Fin Co. (2965); Prommis Solutions, LLC (9978); E-Default Services LLC (0016); Statewide Tax and Title Services LLC (0049); Statewide Publishing Services LLC (0079); Nationwide Trustee Services, Inc. (2436); Statewide Tax and Title Services of Alabama LLC (7733); Nationwide Trustee Services of Virginia, Inc. (6687); Interface Inc. (9903); and Prommis Homeownership Solutions, Inc. (0569). The location of the Debtors' headquarters and the Debtors' service address is 400 Northridge Road, Atlanta, Georgia, 30350.

[2] The definition of terms used herein shall apply equally to the singular and plural forms thereof.

[3] A bid may be filed by a single buyer or by a combination of buyers bidding collectively or individually (hereinafter collectively such individual or combination of bids shall be referred to as a Bid). Any such combination shall be deemed a single Bidder (as defined below) under the Bidding Procedures.

with the Agents[4] and the Official Committee of Unsecured Creditors (the "Committee"), to have satisfied the following conditions (collectively, the "Bid Conditions"):

1.  Form of Bid.  The Debtors will consider all Bid structures, including, but not limited to, offers to purchase substantially all of the Debtors' assets under section 363 of the Bankruptcy Code; provided that any such Bid otherwise complies with the Bid Conditions.

2.  Alternative Transaction Documents.  The Bid must be, in the Debtors' reasonable business judgment substantially on the same or better terms than the terms of the APA.  Each Bid must include an executed copy of any and all transaction documents necessary to effectuate the restructuring transactions contemplated in the Bid (the "Alternative APA").  The Alternative APA shall clearly be marked to show all changes requested by the Bidder (including those related to the purchase price) as well as all other material documents integral to such Bid.

3.  Identity.  All Bids must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Alternative APA), and the complete terms of any such participation.

4.  Contingencies - No Financing or Diligence Outs.  A Bid may include covenants and conditions reasonably acceptable to the Debtors, but under no circumstances shall a Bid be conditioned on the obtaining or the sufficiency of financing or any internal or credit committee approval, syndication requirements, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

5.  Demonstrated Financial Capacity.  A Bidder must have, in the Debtors' reasonable business judgment, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all Executory Contracts and Unexpired Leases to be assumed pursuant to such Bid.

6.  Expenses.  Any Bidders presenting Bids shall bear their own expenses in connection with the proposed transaction.

---

[4] The Agents, as this term is used herein, is Gleacher Products Corp., in its capacities as the administrative agent (in such capacity, the "Administrative Agent"), as first lien collateral agent (in such capacity, the "First Lien Collateral Agent"), as second lien collateral agent (in such capacity, the "Second Lien Collateral Agent"), and as third lien collateral agent (in such capacity, the "Third Lien Collateral Agent"; together with the First Lien Collateral Agent and the Second Lien Collateral Agent, the "Collateral Agents"; the Administrative Agent and the Collateral Agents are collectively referred to herein as the "Agents"), on behalf of the Lenders under that certain Credit and Guaranty Agreement, dated as of June 12, 2012 (as amended, restated, supplemented or otherwise modified from time to time) by and between Prommis Fin Co., a Delaware corporation, as borrower, the other Debtors, as guarantors, the Administrative Agent, each Collateral Agent and the Lenders party thereto.

7.   Irrevocable. A Bid shall be irrevocable until and unless the Debtors accept a higher or otherwise better Qualified Bid and the Bidder is not selected as the Backup Bidder (as defined herein).

8.   Authorization. Bids must contain evidence that the Bidder has obtained all necessary internal authorization or approval, including from its Board of Directors (or comparable governing body), with respect to the submission, execution, delivery, and closing of its Bid and transactions contemplated thereby.

9.   Consent to Jurisdiction. Each Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, and/or the Alternative APA, as applicable.

10.  Initial Minimum Overbid. In addition to satisfying the other Bid Conditions, the aggregate consideration proposed by the Bid must equal or exceed the sum of:

   a.   Cash in an amount equal to cover any tax incurred due to or associated with the proposed structure of the Bid; plus

   b.   $100,000.

11.  Bid Deadline. A Bid must be transmitted via e-mail (in .pdf or similar format) to: (i) Prommis Holdings, LLC, 400 Northridge Road, Atlanta, Georgia, 30350, Attn.: General Counsel; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Christopher J. Marcus and David S. Meyer and Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Ave., Suite 1501, Wilmington, DE 19801, Attn: Steven K. Kortanek; (iii) counsel to the Agents, c/o King & Spalding LLP, Attn:   Michael C. Rupe, Esq., 1185 Avenue of the Americas, New York, New York 10036, and c/o Reed Smith LLP, Attn: Kurt F. Gwynne, Esq., 1201 Market Street, Suite 1500, Wilmington, DE 19801; (iv) proposed counsel to the Committee, Hahn & Hessen LLP, 488 Madison Avenue, 14th Floor, New York NY 10022, Attn.: Mark S. Indelicato, Esq. and Saul Ewing LLP, 222 Delaware Ave., Suite 1200, Wilmington, DE 19801; Attn: Mark Minuti, Esq.; and (v) counsel to Cypress, Law Offices of Mary J. Drury & Associates, 5130 South Fort Apache Road #215-290, Las Vegas, Nevada 89148, Attention:Mary J. Drury, Esq., so as to be actually received on or before May 27, 2013 at 12:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").

A Bid received on or before the Bid Deadline, by a "Qualified Bidder" (as defined below), and that meets the above requirements, shall constitute a "Qualified Bid." The Debtors, with the assistance of their advisors, shall: (a) determine whether any entity is a Qualified Bidder; (b) receive offers from Qualified Bidders; and (c) negotiate any offer made for an Alternative APA together or separately by a Qualified Bidder.  The Debtors will notify the

Qualified Bidders, the Agents, and the Committee whether bids submitted constitute Qualified Bids so as to enable such Qualified Bids to bid at the Auction. Any Bid that is not deemed a "Qualified Bid" shall not be considered by the Debtors. For the avoidance of doubt, (i) the APA is deemed a Qualified Bid and no deposit or other additional conditions shall apply; and (ii) the Agents, on behalf of the Lenders, are deemed to be Qualified Bidders, and any credit bid made by the Agents in an amount not to exceed the pecuniary obligations owed by the Debtors to the Agents shall be deemed a Qualified Bid.

The Debtors will retain the rights to waive or modify the terms of the Bidding Procedures with respect to what Bids may be deemed Qualified Bids.

## Auction

If one or more Qualified Bids are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the Successful Bidder (as defined herein). If no Qualified Bids are received by the Bid Deadline, the Debtors will not conduct the Auction and shall designate the APA as the Successful Bid for the purposes of these Bidding Procedures.

No later than May 27, 2013 at 8:00 p.m. (prevailing Eastern Time), the Debtors will notify the Agents, the Committee, and all Qualified Bidders of the highest or best Qualified Bid, as determined in the Debtors' sole discretion, after consultation with the Agents and the Committee (the "Baseline Bid"), and provide copies of the Baseline Bid to the Agents, the Committee, and all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, after consultation with the Agents and the Committee, reasonably deem relevant to the value of the Qualified Bid to their estates, including, without limitation: (a) the amount and nature of the consideration; (b) compliance with these Bidding Procedures, (c) the certainty of closing; and (d) the net economic effect of any changes to the value to be received from the proposed transaction (collectively, the "Bid Assessment Criteria").

The Auction shall take place at 12:00 p.m. (prevailing Eastern Time) one (1) business day prior to the Sale Hearing at the offices of Debtors' co-counsel, Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Ave., Suite 1501, Wilmington, DE 19801, or such later date and time or other location as selected by the Debtors, after consultation with the Agents and the Committee. The Auction shall be conducted in a timely fashion according to the following procedures:

1.    The Debtors Shall Conduct the Auction.

The Debtors and their advisors shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.

## 2. Terms of Overbids.

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

### a. Minimum Overbid Bidding Increment.

Any Overbid after the Baseline Bid shall be made in increments of at least $100,000 greater than the entire transaction value of the then pending bid; provided, however, that the Debtors, after consultation with the Agents and the Committee, will retain the right to modify the bid increment requirements at the Auction.

### b. Forms of Overbids.

An Overbid may contain alterations, modifications, additions or deletions of any terms of the Bid, but shall otherwise comply with the terms of these Bidding Procedures.

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; provided, the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid shall remain open and binding on the Bidder until and unless (a) the Debtors accept a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Backup Bid.

If less than all of the members of any Qualified Bidder elect to participate in any round of the Auction, such remaining participating member or members shall be required to demonstrate (in order to satisfy clause (i) of the Bid Conditions) such remaining member's or members' financial capacity to consummate the transactions required by such member's or members' Bid.

To the extent not previously provided, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors, after consultation with the Agents and the Committee, demonstrating such Qualified Bidder's ability to close the Alternative Transaction proposed by such Overbid.

### c. Announcing Overbids.

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, among other things, the Bid Assessment Criteria.

During the course of the Auction, the Debtors shall, after the submission of each Overbid, promptly inform each participant which Overbid reflects, in the Debtors' view, after consultation with the Agents and the Committee, the highest or otherwise best offer.

## 3. Additional Procedures.

Only the Debtors, the Agents, any Qualified Bidders, the Committee, the Office of the

United States Trustee, and their respective professionals and representatives will be entitled to attend, participate in, and be heard at the Auction. Only Qualified Bidders will be entitled to make any subsequent bids at the Auction.

The Debtors may announce at the Auction the waiver, modification or addition of procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction.

4.    Closing the Auction.

The Auction shall continue until there is only one Qualified Bid that the Debtors determine in their reasonable business judgment, after consultation with the Agents and the Committee, is the highest or best Qualified Bid (such Qualified Bid, the "Successful Bid," and such Qualified Bidder the "Successful Bidder") at which point, the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid.

Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the closing of the Alternative APA.

For the purpose of clarity, nothing in these Bidding Procedures shall prevent the Debtors from exercising their fiduciary duties under applicable law.

5.    No Collusion; Good Faith Bona Fide Offer.

Each Qualified Bidder participating at the Auction will be required to confirm that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good faith bona fide offer and that it intends to consummate the proposed transaction if selected as the Successful Bidder.

**Backup Bidder**

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Bidder with the next-highest or otherwise second best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, after consultation with the Agents and the Committee, shall be required to serve as a backup bidder (the "Backup Bidder"). The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) open and irrevocable until 5:00 p.m. (prevailing Eastern time) on the earlier of the first business day that is thirty (30) days after the date of the Auction (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder.

If the Successful Bidder fails to consummate an approved Alternative APA, the Debtors may select the Backup Bidder as the Successful Bidder. The Debtors will be authorized, but not

6

required, to consummate the Alternative Transaction of such Backup Bidder without further order of the Bankruptcy Court or notice to any party.

**Highest or Otherwise Best Bid**

Whenever these Bidding Procedures refer to the highest or otherwise best offer, the Debtors may, in their discretion, after consultation with the Agents and the Committee, consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the number, type, and nature of any changes to the APA requested by the Qualified Bidder and whether such Bid is on different terms from those contained in the APA; (b) the extent to which such requested modifications to the APA to the extent applicable to such Bid are likely to delay the confirmation and consummation of the proposed Alternative APA and the cost to the Debtors of any such delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the Qualified Bidder's ability to timely consummate the proposed Alternative APA; and (e) the net benefit to the Debtors' estates and to each of the Debtors' classes of creditors.

**Reservation of Rights**

Notwithstanding anything to the contrary herein, the Debtors, after consultation with the Agents and the Committee, reserve the right to modify these Bidding Procedures at any time, with notice to Bidders and potential bidders, to facilitate the submission of value-maximizing Bids, to adjourn the Auction one or more times for any reason, or to terminate these Bidding Procedures at any time to pursue an alternative restructuring strategy that maximizes value for the Debtors' estates.